# EXHIBIT A

JOSEPH LEVENTHAL - State Bar No. 221043
jleventhal@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
600 West Broadway, Suite 2850
San Diego, California 92101
Telephone: (619) 765-4380

MICHAEL CYPERS - State Bar No. 100641
mcypers@glaserweil.com
JULIE R.F. GERCHIK - State Bar No. 237764
jgerchik@glaserweil.com
WOGAI MOHMAND - State Bar No. 328812
wmohmand@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
California New Car Dealers Association

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

4/21/2025 11:57:26 AM

Clerk of the Superior Court
By E. Noriega        Deputy Clerk

# SUPERIOR COURT OF CALIFORNIA

# COUNTY OF SAN DIEGO

| | |
|---|---|
| CALIFORNIA NEW CAR DEALERS ASSOCIATION, a non-profit trade association, <br><br> Plaintiff, <br><br> v. <br><br> VOLKSWAGEN OF AMERICA, INC., a New Jersey corporation, VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, VOLKSWAGEN AG, a publicly traded German corporation, SCOUT MOTORS, INC., a limited liability company, SCOUT MOTORS SALES LLC, a Delaware corporation, and DOES 1-20, inclusive, <br><br> Defendants. | Case No.: 25CU020560C <br><br> **COMPLAINT FOR:** <br><br> **1. UNFAIR COMPETITION [BUSINESS AND PROFESSIONS CODE SECTION 17200]** <br><br> **2. FALSE ADVERTISING [BUSINESS AND PROFESSIONS CODE SECTION 17500]** |

1

COMPLAINT

302592

Plaintiff California New Car Dealers Association ("CNCDA" or "Plaintiff") hereby files this Complaint for (1) Unfair Competition, under Business and Professions Code section 17200 *et seq.* and (2) False Advertising, under Business and Professions Code section 17500 *et seq.* against Defendants Volkswagen of America, Inc. ("VWA"), Volkswagen Group of America, Inc. ("VWGoA"), Volkswagen AG ("VWAG"), (collectively VWA, VWGoA, and VWAG, are referred to as "VW"), Scout Motors, Inc. ("Scout Motors"), Scout Motors Sales LLC ("Scout Sales") (VW, Scout Motors, and Scout Sales are collectively referred to as "Defendants"), and hereby alleges as follows:

## INTRODUCTION

1.      VW, a multinational corporation, is spending hundreds of millions of dollars to knowingly violate California law. Together with Scout Motors and Scout Sales, VW has taken the extraordinary step of bypassing the California Legislature – and with it their own dealers – to market and sell their Scout electric and gasoline-powered vehicles directly to California consumers. Defendants' actions are in direct contravention of AB 473 and decades of California legislation designed to promote competition in the automobile industry. VW, Scout Motors, and Scout Sales should be immediately prohibited from their direct to California consumer sales, and Scout Motors should be fined $2,500 for each of its violations under the False Advertising Law, which on information and belief, exceeds $35 million in fines based on the average number of California consumers who purchase electric vehicles each year.

2.      In or about 2022, Volkswagen AG, consisting of the global headquarters of Volkswagen in Germany and including its many arms in the United States, acquired and resuscitated an existing brand named Scout Motors. At the time, Scout Motors was in the process of designing sports utility vehicles and trucks and its vehicles were yet to be rolled out.

3.      California law has flatly forbidden an automobile manufacturer from competing with its auto dealerships in the same line-make of vehicles or "brand" due to the tremendous economic disparity between the manufacturer and dealer. However, in 2023, auto industry participants recognized that under existing law, automobile manufacturers might be able to compete indirectly with their dealers by setting up an affiliated brand with a different name. As a response to this

2

**COMPLAINT**

3025922

concern, the California Legislature introduced AB 473.

4.      Scout Motors immediately opposed AB 473 because it changed California's dealer franchise law to prevent franchisors (e.g., VW) from using affiliates (e.g., Scout Motors) to compete indirectly with their dealers in the sale and service of motor vehicles. In fact, Scout Motors explicitly and repeatedly urged the California Legislature to carve out exceptions for its intended direct-to-consumer sales model that would bypass VW dealerships. Significantly, during the AB 473 legislative process, Scout Motors' General Counsel Neil Sitron told the California Legislature that if the bill were enacted, it could effectively "kill[] off" any opportunity for Scout Motors to sell its vehicles directly to California consumers. *See* August 21, 2023, Letter from Neil Sitron to California Legislature, "*Oppose Unless Amended…*".

5.      In response to Scout Motors' concerns, the California Legislature made an accommodation for Scout Motors and VW. Consistent with the goal of promoting fair competition, AB 473 was amended so that affiliate brands (e.g., Scout Motors) can be created or used by franchisors (e.g., VW), **but are required to use franchisees to sell and service motor vehicles**. Thus, Scout Motors could sell its vehicles in California as long as it used new or existing VW-affiliated franchisees to sell those vehicles. This accommodation also extended to other automobile manufacturers. Importantly, however, under AB 473, new and existing franchises would not face indirect competition by an affiliate of their own automobile manufacturer. Instead, they would compete with other franchisees on a level playing field.

6.      On September 11, 2023, the California Legislature passed AB 473. The bill passed unanimously and was signed into law by Governor Newsom on October 7, 2023.

7.      In direct contravention of California law, Defendants have moved forward with their original plans and are bypassing their dealers entirely. Specifically, Defendants have entered into deposit agreements with California consumers through which Scout Motors takes $100 deposits for Scout vehicles directly from California consumers through Scout Motors' website. Defendants are further bypassing their California dealers by engaging in direct marketing of their vehicles, which historically was done in partnership with local dealerships.

8.      Under Defendants' illegal direct-to-consumer sales model, California VW dealers are

3025922

deprived of the opportunity to sell highly desirable Scout Motors vehicles, resulting in significant financial losses to CNCDA's members—including, but not limited to, loss of livelihood for the dealers, loss of jobs for the employees who work at dealerships (which are one of California's largest employers and generators of sales tax revenue), and lost investment in the dealership showrooms.

9.    Defendants are knowingly and intentionally violating California law. In direct contravention of AB 473 and its prohibition on a vehicle manufacturer competing with its dealer network through an affiliate brand, Defendants have engaged and are now engaging in direct-to-consumer sales and marketing — thereby openly competing with their own dealers. Indeed, **Scout Motors has accepted over 50,000 reservations and deposits directly from consumers for its vehicles**. Defendants must not be permitted to continue to disregard California law to the serious detriment of their dealers and the related economy.

## THE PARTIES

10.    Plaintiff CNCDA is a statewide trade association that represents the interests of more than 1,400 franchised new car and truck dealer members and has pushed the auto industry forward for over 100 years.

11.    CNCDA's organizational purpose is to protect the interests of its franchised dealers. CNCDA advocates for franchised dealers through lobbying the legislature and regulatory agencies on behalf of its members, provides guidance on issues directly impacting franchises, defends against excessive regulations while promoting implementation and enforcement of fair and reasonable government rules, and ensures a healthy business climate for dealer operations.

12.    CNCDA members engage in the retail sale and lease of new vehicles and also engage in automative service, repair, and parts sales.

13.    CNCDA member dealers' total sales in California reached $154 billion in 2024, selling approximately 1.76 million new cars and contributing 21% of the total California statewide sales tax collected.

14.    CNCDA member dealerships provide a substantial number of jobs in California. As of 2024, CNCDA members provided 138,478 jobs in the state of California and had a total

4
**COMPLAINT**

3025922

employee payroll of $14.64 billion.

15.    In 2024, CNCDA member dealerships paid approximately $13.8 billion in state and federal taxes. In the same year, CNCDA member dealerships spent approximately $3.5 billion on products and services from other California businesses.

16.    In 2024, CNCDA member dealerships paid approximately $1.28 billion in advertising expenditures.

17.    In 2024, CNCDA member dealerships spent approximately $70.75 million on charitable and civic organizations.

18.    CNCDA's members include VW franchised dealers who, due to Scout Motors' unlawful direct-to-consumer sales, are now in direct competition with a VW affiliate that is selling and servicing vehicles directly to consumers in a sales and marketing program approved by VW executives at the highest level.

19.    CNCDA members who conduct business under written franchise agreements with VWA have a strong interest in knowing whether Scout Motors' direct-to-consumer sales are a violation of the Vehicle Code. This is especially true since VW, through Scout Motors, insists on moving forward with its direct-to-consumer model and has stated that Scout Motors has accepted over 50,000 reservations and deposits in the United States for its vehicles.

20.    Absent an adjudication of the merits of this lawsuit, Defendants' business practices will continue to undermine long-standing and recently passed California laws meant to protect dealers and consumers under the Vehicle Code by unlawfully allowing VW to compete with its dealer network for vehicle sales indirectly through its affiliate Scout Motors.

21.    CNCDA has standing to assert its claims for violation of the Unfair Competition Law, Business and Professions Code section 17200 *et seq.* and the False Advertising Law, Business and Professions Code section 17500 *et seq.* The interests CNCDA seeks to protect are germane to its purpose, which is the promotion of a legal and regulatory climate conducive to a robust business environment for California's car dealers, compliance with applicable law, protection of its members from illegal conduct, and clarification of legal and regulatory mandates. VW dealers who are members of CNCDA have standing to sue in their own right regarding Defendants' violations of the

5
**COMPLAINT**

3025922

Vehicle Code. Neither the claims asserted nor the relief requested in this Complaint requires the participation of individual CNCDA members in this lawsuit because, among other reasons: (a) CNCDA does not seek recovery of monetary damages, and therefore no individual examination of injury is required, and (b) the Vehicle Code's protection for franchises that prohibits legacy manufacturers from competing with their own dealer networks applies to all CNCDA members.

22. CNCDA represents the association's members, a readily identifiable group. Additionally, CNCDA's members have a common interest in the questions of law and fact in this lawsuit because CNCDA members have a common interest in: (a) a determination of their rights and duties vis-à-vis Defendants with respect to the program of direct sales of Scout Motors vehicles to California consumers; (b) seeing California franchise laws obeyed and enforced; and (c) the elimination of any ambiguity regarding these matters to help guide their conduct in accordance with the law.

23. CNCDA has standing to assert a claim in its own right under the Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, against Defendants because CNCDA has lost money or property as a result of Defendants' unfair competition.

24. CNCDA has standing to assert a claim in its own right under the False Advertising Law, Business and Professions Code section 17500, *et seq.*, against Defendants because CNCDA has lost money or property as a result of Scout Motors' false advertising.

25. Defendant Volkswagen of America, Inc. ("VWA") is a New Jersey corporation and an operating unit of Volkswagen Group of America, Inc., which has an equity interest directly or indirectly controlled or owned by Volkswagen AG, who also directly or indirectly own an equity interest of Scout Motors. California VW dealers have individual written dealer agreements with VWA.

26. Defendant Volkswagen Group of America, Inc. ("VWGoA") is a New Jersey corporation with its principal place of business in Reston, Virginia. On information and belief, VWGoA has an equity interest directly or indirectly controlled or owned by Volkswagen AG, who also directly or indirectly own an equity interest of Scout Motors.

27. Defendant Volkswagen AG, also known as Volkswagen Group, ("VWAG") is a

6
**COMPLAINT**

3025922

German public multinational manufacturer of vehicles with its principal place of business in Wolfsburg, Germany. VWAG sells cars under several brands, including but not limited to Audi, Porsche, Škoda, and Volkswagen. On information and belief, Defendant Scout Motors is a wholly owned brand of VWAG.

28.     Defendant Scout Motors, Inc. ("Scout Motors") is a Delaware corporation with its principal place of business in McLean, Virgina. Scout Motors is an American automotive company that is wholly owned by Volkswagen AG, which obtained the Scout brand after acquiring American truck manufacturer Navistar International in 2021.

29.     Defendant Scout Motors Sales LLC ("Scout Sales") is a Delaware limited liability company with its principal place of business in McLean, Virginia. Scout Sales is qualified to do business in California through a California Department of Motor Vehicle dealer license that is registered in Fremont, California. On information and belief, Scout Sales is a wholly owned direct subsidiary of Scout Motors, and therefore a 100% indirect subsidiary of Volkswagen AG.

### JURISDICTION AND VENUE

30.     This Court has jurisdiction to hear the subject matter of this complaint as the conduct that led to Plaintiff's damages took place in this state.

31.     This Court has jurisdiction over Defendants in this action because each of the Defendants have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, Defendants' agents, or Defendants' personal representatives purposefully directed activities at, or availed themselves of, the forum state in such a significant manner that Defendants could reasonably anticipate being haled into court here, as evidenced by the fact that Defendant Scout Motors has accepted deposits for its vehicles from California residents in contracts that expressly state that they are binding. On information and belief, in order for a consumer to buy or lease a Scout vehicle, the consumer must have (1) signed a Reservation Agreement with Scout Motors and (2) paid Scout Motors a financial deposit. In addition, Defendant Scout Motors has directed its marketing activities towards California residents, and Defendants have announced their intention to open Scout Motors stores and service centers in 16 major markets, including in San

3025922

Diego, California.

32.    Venue is proper in this judicial district against each Defendant because, on information and belief: (1) Defendants have committed wrongful acts in this judicial district, including by taking $100 deposits from consumers in this judicial district or by directing marketing materials to solicit direct sales to consumers who reside in this district; (2) the VW Defendants aided and abetted Scout Motors and Scout Sales in soliciting deposits for Scout vehicles from consumers in this judicial district, and (3) Defendants have declared their intention to open a storefront in this judicial district to sell, service, lease, or repair Scout Motors vehicles directly to consumers.

## STATEMENT OF FACTS

### History and Purpose of California Auto Dealer Franchise System

33.    California's Vehicle Code, which codified the auto dealer franchise system, was originally developed by manufacturers as a cost-effective way to expand into local markets and tap into a franchise dealers' resources and the dealers' superior knowledge about those local markets.

34.    Over time, dealers realized they were largely at the mercy of manufacturers, despite dealers' large investments (both time and money) in infrastructure in order to sell their vehicles. Manufacturers had the power to replace their dealers, could refuse to allocate popular inventory to the dealers, or would open nearby competing dealerships. The relationship between manufacturers and their dealers was inherently asymmetrical, leaving dealers at the mercy of their manufacturers.

35.    In response to the significant disparity in economic power, dealers prevailed upon their local regulators to enact legislation governing the relationship between dealers and the manufacturers in order to promote fair competition. In 1972, the California Legislature passed the Automobile Franchise Act (the "Act") "'in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor'" (among other reasons). *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.* ("*Fox*"), 439 U.S. 96, 101, fn. 6 (1978) (citing Historical and Statutory Notes for Vehicle Code).

36.    The franchise laws are designed to prevent predatory practices by manufacturers such

3025922

as forcing dealerships to accept unwanted deliveries of cars and requiring "line-make"[1] franchise dealerships to incur unnecessary advertising expenses. *Fox*, 439 U.S. at 100-101 ("disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers."); *see also Tober Foreign Motors v. Reiter Oldsmobile*, 381 N.E.2d 908, 914 (Mass. 1978); Stephen M. Fox, *Two Roads Diverged: Tesla, Interruption, and the Commerce Clause*, 22 B.U. J. Sci. & Tech. L. 153, 155 (2016).

37.    Notably, the United States Supreme Court stated: "the California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices," making it clear that the Vehicle Code's framework around franchises is focused on promoting fair competition. *Fox*, 439 U.S. at 107; *see also Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp., U.S.A.*, 221 Cal. App. 4th 867, 877 (2013) (noting that some 25 states have enacted legislation to protect dealers from "abusive and oppressive acts by the manufacturers.").

***The California Vehicle Code and its 2023 Amendments***

38.    Under Vehicle Code section 331, a "franchise" is defined as follows:

(a) A "franchise" is a written agreement between two or more persons having all of the following conditions:

(1) A commercial relationship of definite duration or continuing indefinite duration.

(2) The franchisee is granted the right to offer for sale or lease, or to sell or lease at retail new motor vehicles or new trailers subject to identification pursuant to Section 5014.1 manufactured or distributed by the franchisor or the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities.

(3) The franchisee constitutes a component of the franchisor's distribution system.

---

[1] "Line-make" means a group or series of motor vehicles that have the same brand identification or brand name, based upon the manufacturer's trademark, trade name, or logo.

3025922

(4) The operation of the franchisee's business is substantially associated with the franchisor's trademark, trade name, advertising, or other commercial symbol designating the franchisor.

(5) The operation of a portion of the franchisee's business is substantially reliant on the franchisor for a continued supply of new vehicles, parts, or accessories.

39. Under Vehicle Code section 331.1, a "franchisee" is defined as "any person who, pursuant to a franchise, receives new motor vehicles subject to registration under this code…from the franchisor and who offers for sale or lease, or sells or leases the vehicles at retail or is granted the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities."

40. Under Vehicle Code section 331.2, a "franchisor" is defined as "any person who manufactures, assembles, or distributes new motor vehicles subject to registration under this code."

41. Under Vehicle Code section 11713.3(z), an "affiliate" is defined as "a person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under the common direction and control with, another person. 'Control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any person."

42. Under the Vehicle Code's definitions, VW dealers are franchisees of VW – a franchisor – that operate under franchise agreements in order to sell, service, and repair VW vehicles. Scout Motors is an affiliate of VWAG because it is wholly owned by VWAG and is under the "common direction and control" of VWAG.

43. Prior to AB 473, Vehicle Code section 11713.3 made it "unlawful and a violation…for a manufacturer, manufacturer branch, distributor, or distributor branch….[t]o compete with a dealer in the **same line-make** operating under an agreement or franchise from a manufacturer or distributor in the relevant market area." (emphasis added). The prior version of the law did not expressly prevent franchisors – i.e. vehicle manufacturers – from using affiliates to compete with their own dealer franchises in the sale and service of motor vehicles. This created a

10

**COMPLAINT**

Glaser Weil

3025922

gap in the law that vehicle manufacturers could exploit to turn the franchise laws back in their favor.

44. In 2023, CNCDA sponsored AB 473 in the California Legislature in order to "strengthen and update California's franchise laws to create a stronger and more equitable vehicle franchise system for our members."[2] One of the main purposes of AB 473 was to "[p]rotect the underlying intent of the vehicle franchise system by precluding manufacturers from launching a new brand name of vehicles as a way that would compete directly with their franchised dealer network."[3] The amendments were focused on promoting fair competition among franchisees by preventing vehicle manufacturers from competing directly or indirectly through an affiliate brand with their own dealer networks.

45. During the legislative process of AB 473, Scout Motors was vocal in its opposition to the law. In materials for the Assembly Committee on Transportation, the Committee noted:

> "Scout Motors is opposing the bill, arguing the anti-competition language in the bill 'would serve to prohibit Scout Motors (or any other new-to-the-market manufacturer would be statutorily banned from using newly appointed intendent dealers, using existing independent dealers, or selling direct to California in any affiliate of such manufacturer were selling motor vehicles.'
>
> **To address this concern the author amended the bill to permit competition so long as the vehicle is being sold *using new or existing franchisees* to sell and service those vehicles.** It would still prohibit Scout Motors or any new vehicle line from a manufacturer with a dealership network in California from being sold directly to customers. **Volkswagen, the parent company of Scout Motors, could sell Scout vehicles in the state if they sell them at any of their other vehicle line company's dealerships like Volkswagen, Audi, Porsche, Bentley or Lamborghini. Volkswagen Group could also create a new franchise network for Scout Motors if they want to keep a separate brand distinct from their other models.** This provision would not affect Tesla, which does not have a dealership network to directly compete against." (emphasis added).

46. Scout Motors also formally proposed edits to the language of AB 473 that would specifically carve out an exception for when vehicle manufacturers "creat[e] a new line of motor

---

[2] SUPPORT AB 473: CNCDA's 2023 Franchise Bill, https://www.cncda.org/advocacy/ab-473/.

[3] *Id.*

3025922

vehicles that are exclusively battery electric vehicles that are manufactured in the United States." This suggestion was rejected.

47. Scout Motors also attempted to carve out another exception solely for its benefit by proposing that certain affiliates be excluded from the law until 2029. This proposal had no public policy rationale and was also rejected.

48. On August 21, 2023, Scout Motors' General Counsel Neil Sitron wrote to the California Legislature stating that if AB 473 was amended, **it could prohibit Scout Motors from "sell[ing] its vehicles directly to California consumers."** *See* August 21, 2023, Letter from Neil Sitron to California Legislature, *"Oppose Unless Amended..."* (emphasis added). Indeed, in Mr. Sitron's letter to California Senate President Toni Atkins and Appropriations Chairman Anthony Portantino, **Scout Motors' General Counsel stated that he understood that under AB 473, Scout would not be able to bypass VW's dealers, and instead would be required to respect California's time-honored position that manufacturers are forbidden from competing with their dealers.** *Id.* (Mr. Sitron wrote: "Under [AB 473's] language... [a manufacturer] would be statutorily banned from deciding its distribution model in California..."). **Mr. Sitron admitted during the legislative enactment process of AB 473 that the amended law would "kill[] off" any opportunity for Scout Motors to sell its vehicles directly to California consumers.** *Id.* (emphasis added).

49. Scout Motors' suggestions were rejected, and AB 473 (which took effect on January 1, 2024) amended Vehicle Code section 11713.3(o) to prevent an automaker from circumventing its existing dealer network by creating an affiliate brand that competes with existing dealers by selling and leasing vehicles directly to consumers and servicing such vehicles. The proposed amendments to the legislation were designed to ensure that while new brands could enter the market, existing franchise operations in California—like VW—would not be permitted to circumvent their established franchised dealers through affiliate brands like Scout Motors. The additions to the legislation state that:

> "It is unlawful and a violation of this code for a manufacturer, manufacturer branch, distributor, or distributor branch licensed pursuant to this code to do, **directly or indirectly through an**

12

**COMPLAINT**

3025922

**affiliate**, any of the following:

//

(o)(1) **To compete with their franchisees in the sale, lease, or warranty service of new motor vehicles."** (emphases added).

50.    The amendments to AB 473 therefore allow franchisors, like VW, to use affiliates to sell vehicles only if they sell those vehicles using new or existing franchisees. The California Legislature was clear when it passed the law (and rejected Scout Motors' proposals) that it intended to address the asymmetrical relationship between franchisors and franchisees, promote fair competition, and increase equity in franchises.

51.    Defendants' ongoing program of selling Scout Motors vehicles – which is an affiliate of VW under the Vehicle Code – directly to consumers is prohibited by the Vehicle Code because it cuts out VW dealers as the franchisees.

52.    AB 473 expressly contemplates manufacturers, such as VW, selling or leasing vehicles through affiliates, such as Scout Motors. This is highlighted by the exception in Vehicle Code section 11713.3(o)(4)(B), which states "a manufacturer, manufacturer branch, distributor, or distributor branch, or an affiliate thereof, shall not be deemed to be competing with their franchisees in any of the following limited circumstances....**When creating a new line of motor vehicles and using new or existing franchisees to sell and service those vehicles.**" (emphasis added). In other words, a manufacturer like VW with franchisees may create a new brand, but it must use a franchise dealer network to sell those vehicles to satisfy the exception.

*Defendants' Blatant Violation of the California Vehicle Code In Its Direct-to-Consumer Sales*

53.    Scout Motors does not fall within the exception in Vehicle Code section 11713.3(o)(4)(B) because Scout Motors is not using franchises within the VW network to sell its vehicles. In fact, Scout Motors is not using franchisees *at all.*

54.    Scout Motors admits it is a wholly owned subsidiary and affiliate of VW, as confirmed by VW executives' affirmative statements admitting as much. Indeed, statements by VW's executives demonstrate VW's control or direction of Scout Motors. For example, as of

13

**COMPLAINT**

3025922

January 8, 2025, Volkswagen Group Chairman Oliver Blume admitted that VWAG had invested billions of dollars in North America, pointing specifically to VWAG's efforts to expand its North American reach through its brand Scout.[4]

55.     In addition, on or around January 7, 2025, Oliver Blume, the Chairman of VWAG – not the CEO of Scout Motors – announced that Scout Motors had received more than 50,000 reservations and deposits for Scout Motors' vehicles, demonstrating VW's clear involvement in and knowledge of Scout Motors' operations and business.[5]

56.     In its 2024 Annual Report, VWAG stated: "Under the Volkswagen Group's North American strategy, **Scout Motors Inc., Tysons/USA, a wholly owned subsidiary in the Volkswagen Group**, was established in Fiscal Year 2022." (emphasis added). The report also reported: "The company [Scout Motors] has been included in the Volkswagen consolidated financial statements since January 1, 2023."

57.     On January 17, 2025, Scout Motors' executives, to evade the law and despite multiple admissions otherwise, claimed that they are an "independent" company, separate from VW. In a letter to CNCDA, Scout's General Counsel Mr. Sitron stated that: "Scout Motors and the Scout brand exist and operate independently of VWGoA and its brands such as Volkswagen and Audi. They will continue to do so in the future." *See* January 17, 2025 Letter from Neil Sitron to Michael Cypers. But such statements are in direct contrast to admissions from the CEOs of both Scout Motors and VWAG and directly contravene VW's investment and involvement in the Scout brand.

58.     Scout Motors CEO Scott Keogh also admitted on or around February 13, 2025 that Scout is "100%" a brand of VWAG, stating:

> "First and foremost, **100% Scout Motors is part of the Volkswagen Group.** The Volkswagen Group, as you know as well as anyone, holds a whole host of brands from Škoda to Bentley to Porsche to Audi and other things. We are one of those brands. **Our reporting line is from here in the states, Scout Motors is a LLC, and reports into the**

---

[4] Jack Walsworth, *With Scout and Cupra inbound, Blume confident in VW Group's fortunes in U.S.*, Jan. 8, 2025, https://www.autonews.com/volkswagen/an-ces-2025-blume-vw-group-outlook/.

[5] Michael Wayland, "VW's Scout has more than 50,000 reservations for upcoming EVs as automaker aims to grow U.S. share," Jan. 8, 2025, https://www.cnbc.com/2025/01/08/scout-motors-electric-vehicles-ev-reservations.html.

14
**COMPLAINT**

3025922

**Volkswagen Group directly in Germany.** So for me, for example, I report into the Board. We have board meetings there, we give them updates, away we go. **They are the sole provider, funder of the company as of right now**, but we've structured the company in a way that if we want to be strategic partners with someone else, if we want to seek outside capital, if potentially we want to go public, the company's been structured to do that."[6] (emphases added).

59.     This renders Scout Motors ineligible for any exception to the Vehicle Code because it is an affiliate of VWAG.

60.     In addition, Mr. Keogh stated that "[w]e [Scout Motors] are one of the brands of the Volkswagen Group, full stop. They fund it, they strategically made the decision to investment [sic]…"[7]

61.     Despite Scout Motors' clear involvement in the legislative process and its knowledge that amendments to AB 473 would **"kill[] off"** Scout Motors' ability to sell its vehicles directly to California consumers, Defendants are now proceeding with a distribution model that explicitly violates the clear statutory language of AB 473. *See* August 21, 2023, Letter from Neil Sitron to California Legislature, "*Oppose Unless Amended…*" (emphasis added). Scout Motors has announced its intention to begin production of its vehicles in 2026 with a release directly to the general public in 2027.

62.     On information and belief, Scout Motors is highly motivated in moving forward with its direct-to-consumer model because it does not want to share profits with local dealerships when selling the desirable and highly profitable Scout electric and gasoline-powered vehicles, and Scout Motors wants to reduce its warranty costs by not paying franchisees their statutory rates.

63.     On information and belief, Scout Sales obtained a California dealer license through the Department of Motor Vehicles and is the entity responsible for selling and distributing vehicles to California consumers when such vehicles become available.

64.     Scout Motors has begun actively soliciting and accepting deposits for Scout Motors

---

[6] "The Re-Emergence of Scout Motors With President and CEO Scott Keogh," The InEVitable Podcast, at 27:52-28:42, https://www.motortrend.com/features/scout-motors-ceo-scott-keogh-inevitable-vodcast-podcast-episode-113/.
[7] *Id.* at 29:20-27.

15
**COMPLAINT**

3025922

vehicles directly from California residents and to the exclusion of its dealers. In accepting $100 deposits for vehicles, Scout Motors entered into contracts with consumers called the "Reservation Agreement." No consumer can purchase a Scout Motors vehicle without first making a $100 deposit to Scout Motors and entering the Reservation Agreement, which is a binding contract (see **Exhibit A**).

65.    The Reservation Agreement explicitly states: "By this agreement, together with your payment of the Reservation Fee, you are reserving a **future purchase** of your selected Scout vehicle." (emphasis added). A Scout Motors vehicle cannot be sold to a consumer without that consumer first entering into the Reservation Agreement and paying the $100 deposit. The language of the Reservation Agreement reinforces this by stating that Scout Motors "will provide a credit to the final price equivalent to the Reservation Fee" when a consumer completes the future purchase of their Scout Motors vehicle.

66.    On information and belief, the number of reservations and deposits Scout Motors receives and will receive will affect and alter the production volume for Scout Motors.

*Defendants' Blatant Violation of the California Vehicle Code In Its Direct-to-Consumer Marketing*

67.    Scout Motors has engaged in extensive advertisement of its vehicles throughout California, encouraging consumers in its advertising to place a deposit directly with Scout Motors for a vehicle.

68.    Scout Motors' advertisements throughout California are false and misleading because Scout Motors does not disclose to its consumers that the transaction is illegal under the California Vehicle Code. California Business and Professions Code section 17500 makes it unlawful for a corporation to "directly or indirectly **to dispose of real or personal property** or to perform services, professional or otherwise, or anything of any nature whatsoever or to **induce the public to enter into any obligation relating thereto**, to make or disseminate or cause to be made or disseminated before the public in this state…including over the **Internet**… any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof,

16
**COMPLAINT**

3025922

which is **untrue or misleading**." (emphases added).

69.    Each violation of California Business and Professions Code section 17500, meaning every $100 deposit for its vehicles by a California resident, is "a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding **two thousand five hundred dollars ($2,500)**, or by both that imprisonment and fine." (emphasis added).

70.    On information and belief, Scout Motors has accepted and continues to accept $100 deposits directly from California consumers to reserve Scout Motors vehicles and has stated its intention to sell new motor vehicles directly to consumers, including consumers in San Diego County.

71.    On information and belief, Scout Motors is "induc[ing] the public to enter into an[] obligation relating" to the purchase of personal property by accepting $100 deposits for its vehicles in violation of California Business and Professions Code section 17500.

72.    On information and belief, VW, acting through multiple VW executives and entities, has aided and abetted Scout Motors and Scout Sales, and is aiding and abetting Scout Motors and Scout Sales, in soliciting deposits for its vehicles from California residents. VW is also encouraging and/or funding the direct-to-consumer model in violation of Vehicle Code section 11700.3, which states that "[n]o person may aid and abet a person in the performance of any act in violation of this chapter." VW has also aided and abetted, and is aiding and abetting, Scout Motors' and Scout Sales' clear violation of AB 473 by bypassing VW's own dealer network.

73.    On information and belief, Defendants' actions in soliciting deposits for transactions that are illegal is also a violation of the Federal Trade Commission Act, 15 U.S. Code § 45, which states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

*VW Causes Significant Harm*

74.    VWA entered into written "Dealer Agreements" with California dealerships to sell its vehicles. These Dealer Agreements outline the relationship between automobile manufacturer as the franchisor and a local dealership as a franchisee. Under these Dealer Agreements, VWA sells and delivers authorized vehicles to the dealership, and the dealership assumes the responsibility for the

17
**COMPLAINT**

3025922

promotion and sale of those vehicles in the dealership's geographic area. Dealer Agreements are meant as a comprehensive relationship where a dealer has access to VW inventory.

75.    Bypassing VW dealers causes significant harm to its dealers who risk losing their livelihoods in an already difficult auto industry in favor of Defendants' desire to keep profits from direct sales for themselves. Sidestepping dealers also harms Californians in other ways. Defendants' direct-to-consumer model also threatens tens of thousands of jobs of other Californians connected to the dealer economy. It also deprives consumers of intra-brand competition and greatly limits options for warranty and recall work.

76.    CNCDA has suffered injury because it has diverted significant financial resources and executive and staff time to investigate and counteract Defendants' violations of the law. Following Defendants' announcement that Scout vehicles would be sold directly to consumers, CNCDA commissioned a comprehensive independent analysis into Defendants' illegal activity and how to bring Defendants into compliance with the law, including, but not limited to, civil litigation, administrative action, and contact with legislators.

77.    In addition, after expending significant resources on behalf of its members to sponsor and advocate for AB 473, CNCDA has now expended even further resources to investigate Defendants' threatened and actual violations of the California Vehicle Code and to prevent the violations of the very law it worked to enact in the California Legislature, which was enacted after Scout's active participation. CNCDA's efforts to counteract Defendants' violations of the law requires CNCDA to expend even more resources that would otherwise be spent on other issues germane to CNCDA's organizational purposes.

78.    Dealers across the entire country are concerned with Defendants' direct-to-consumer model. The National Automobile Dealers Association ("NADA"), which is a trade association representing nearly 16,500 franchised new car and truck dealerships across the United States, sent an instructive letter to Oliver Blume, Chairman of the Executive Board of VWAG on March 6, 2025. *See* **Exhibit B**. In the letter, NADA states that it "fully stands behind VW, Audi, and Porsche dealers that are being left behind by this decision that violates protections provided by state law. Your U.S. dealers have always been trusted partners who have made significant investments and

18
**COMPLAINT**

3025922

stood behind the brands – in good times, and bad…" *Id.* NADA also emphasized in the letter that other vehicle manufacturers successfully launched new brands using a selected subset of their existing dealer networks for distribution, and the same could be true for Defendants' sale of Scout Motors vehicles. *See id.* NADA's March 2025 attempt to discuss Defendants' distribution model comes after numerous attempts to discuss with Defendants' management that the "franchise system is the best and most efficient way to deliver the customer experience that today's marketplace demands." *Id.*

79. Defendants' violation of the Vehicle Code is so blatant that on February 6, 2025, Assembly Majority Leader and Representative in the California State Assembly, District 4, Cecilia Aguiar-Curry, who was one of the authors of AB 473, sent a letter to Neil Sitron, General Counsel of Scout Motors, and Antony Klapper, Senior Vice President and General Counsel of VWAG stating:

> "VW and Scout have begun accepting deposits for Scout vehicles directly from California residents, excluding existing or future franchised dealers from the sales and service process. **Such practices violate Vehicle Code section 11713.3(o), as amended by AB 473, which expressly forbids an automaker from competing with its own dealers through an affiliate brand.**
>
> California's franchised dealerships—and the consumers they serve—stand to suffer harm from Scout's stated distribution model. Franchised dealerships provide not only sales but also local maintenance and warranty services, fueling vital economic activity throughout the state. Scout's stated plan erodes these consumer protections, eliminates local business opportunities, and disregards the clear legislative language and my intent of AB 473.
>
> As the Assembly Majority Leader and author of AB 473, I'm asking you to reconsider Scout's distribution, sales, and service plans and ensure that Scout's practices comply with the law." (emphasis added).

(attached as **Exhibit C**).

80. Scout Motors' CEO Scott Keogh and General Counsel Neil Sitron know that Scout Motors' sales directly to California consumers violate the California Vehicle Code.

81. Multiple senior executives of VW, including but not limited to Antony Klapper, Kjell Gruner, and Oliver Blume, similarly know that Scout Motors' sales directly to California consumers

19
**COMPLAINT**

3025922

violate the California Vehicle Code.

82.     Defendants' blatant violation of California law must not be permitted.

### FIRST CLAIM FOR RELIEF

### UNFAIR COMPETITION, VIOLATION OF BUSINESS AND PROFESSIONS

### CODE § 17200

### (Against All Defendants)

83.     CNCDA hereby realleges and incorporates by this reference the allegations from the above paragraphs as if fully set forth herein.

84.     By engaging in the conduct described in this complaint, CNCDA is informed and believes that Defendants have violated and continue to violate California Vehicle Code section 11713.3(o) by taking reservations and deposits for Scout Motors vehicles in its direct-to-consumer model. Defendants' conduct alleged above constitutes and was intended to constitute unlawful and unfair business practices within the meaning of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq.*

85.     By engaging in the conduct described in this complaint, CNCDA is informed and believes that the VW Defendants, through multiple executives, have violated and continue to violate California Vehicle Code section 11700.3 by aiding and abetting Scout Motors in its scheme to take reservations and deposits for Scout Motors vehicles in its direct-to-consumer model. Defendants' conduct alleged above constitutes and was intended to constitute unlawful and unfair business practices within the meaning of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq.*

86.     By engaging in the conduct described in this complaint, CNCDA is informed and believes and thereon alleges that Defendants have violated and continue to violate Business and Professions Code section 17500 by accepting deposits for a transaction that they knew, or should have known, was illegal and therefore untrue and misleading under the definitions of the statute. Defendants' conduct alleged above constitutes and was intended to constitute unlawful and unfair business practices within the meaning of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq.*

**COMPLAINT**

3025922

87. By engaging in the conduct described in this complaint, CNCDA is informed and believes that Defendants knowingly and blatantly disregarded the Federal Trade Commission Act, 15 U.S. Code § 45, by taking deposits for Scout Motors vehicles in its direct-to-consumer model. Defendants' conduct alleged above constitutes and was intended to constitute unlawful and unfair business practices within the meaning of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq.*

88. During all relevant times to this complaint, Defendants engaged in or still engage in fraudulent, unfair, or unlawful business practices, as defined in the Unfair Competition Law, Business and Professions Code section 17200 *et seq.* and in violation of California law.

89. A business act or practice is unfair where it offends an established public policy or when the practice is illegal, immoral, unethical, or oppressive. Defendants have engaged in unfair business practices as a result of the actions alleged herein. By engaging in a direct-to-consumer model to reserve and sell Scout Motors vehicles, Defendants invoked, tolerated, encouraged, or enticed violation of the California Vehicle Code, the Business and Professions Code, and the Federal Trade Commission Act, and thus engaged in unfair business practices designed to give it an unfair competitive advantage.

90. The acts and practices of Defendants are unlawful because they constitute a violation of each of: California Vehicle Code section 11713.3, California Vehicle Code section 11700.3, Federal Trade Commission Act, 15 U.S. Code § 45, and California Business and Professions Code section 17500 *et seq.*, as described in this complaint.

91. Plaintiff has suffered economic damage and loss as a result of Defendants' violations of the California Vehicle Code, the Business and Professions Code, and the Federal Trade Commission Act.

92. As a result of Defendants' violation of the Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, Defendants are unjustly enriching themselves at the expense of Plaintiff's California members. Any and all increases in revenue for Defendants caused by the acts and practices described herein will directly correspond to an increased sale value by which Defendants are unjustly enriched. Defendants should be required to disgorge illegal gains for the

Glaser Weil

3025922

purpose of making full restitution to Plaintiff.

93.    As a direct and proximate result of Defendants' conduct as described herein, Plaintiff has been harmed in an amount to be proved at trial.

94.    Plaintiff further seeks, and as a result of the foregoing is entitled to, an order granting injunctive relief against Defendants to prohibit Defendants from taking deposits for and selling Scout Motors vehicles to California consumers in their direct-to-consumer model.

**SECOND CLAIM FOR RELIEF**

**FALSE ADVERTISING, VIOLATION OF BUSINESS AND PROFESSIONS**

**CODE § 17500**

**(Against Scout Motors)**

95.    CNCDA hereby realleges and incorporates by this reference the allegations from the above paragraphs as if fully set forth herein.

96.    By engaging in the conduct described in this complaint, CNCDA is informed and believes that Scout Motors violated and continues to violate the law by taking $100 deposits from California consumers for Scout Motors vehicles in its direct-to-consumer model when it knew or should have known that such transactions are unlawful.

97.    Scout Motors has deliberately and willfully made, disseminated, or caused to be made or disseminated, untrue or misleading statements or by the exercise of reasonable care should have known, that the statements were untrue and misleading, with the intent to induce members of the public to place $100 deposits for Scout Motors vehicles. Scout Motors knew, or should know, that such transactions are unlawful and therefore false and misleading.

98.    Scout Motors' statements are likely to deceive consumers because it is probable that advertisements requesting $100 deposits for a Scout Motors vehicle could mislead a significant portion of targeted consumers. The targeted consumers likely to be deceived have acted and act reasonably in these circumstances.

99.    Scout Motors' conduct is likely to cause confusion, mistake, or deception, or constitute actual deception or confusion or probable deception or confusion, because a reasonable consumer would not know or have reason to know that Scout Motors' reservation and deposit



22

**COMPLAINT**

3025922

system is unlawful.

100.    Based on its extensive involvement in the legislative process and its statements, Scout Motors, and several senior executives including Neil Sitron and Scott Keogh, have actual knowledge or should have known that taking $100 deposits for its vehicles is a false advertisement because they know or should know of the unlawful nature of its direct-to-consumer model.

101.    As a result of Scout Motors' violation of the False Advertising Law, Business and Professions Code section 17500 *et seq.*, Scout Motors is unjustly enriching itself. Any and all increases in revenue for Scout Motors caused by the acts and practices described herein will directly correspond to an increased sale value by which Scout Motors is unjustly enriched. Scout Motors should be required to disgorge illegal gains for the purpose of making full restitution.

102.    As a direct and proximate result of Scout Motors' conduct as described herein, Plaintiff has been harmed in an amount to be proved at trial.

103.    Plaintiff further seeks, and as a result of the foregoing is entitled to, an order granting injunctive relief against Scout Motors to prohibit Scout Motors from taking reservations and deposits for and selling Scout Motor vehicles to California consumers in their direct-to-consumer model.

104.    A violation of Business and Professions Code section 17500 "is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine." Bus. & Prof. Code § 17500. Scout Motors, and each of its executives who have engaged or is engaging in false advertising in violation of Business and Professions Code section 17500 *et seq.*, is subject to either a misdemeanor, fine up to $2,500, or both.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.      For declaratory relief that Defendants' direct-to-consumer model to sell Scout Motors vehicles is unlawful under California Vehicle Code section 11713.3;

2.      For a permanent injunction, a preliminary injunction, and a temporary restraining order prohibiting Defendants from selling Scout Motors' vehicles directly to consumers and to

23
COMPLAINT

3025922

prevent Scout Motors from taking deposits for Scout Motors vehicles directly from California residents;

3.    For prejudgment interest;

4.    For restitution;

5.    For misdemeanor findings and a fine of $2,500 per violation of Business and Professions Code section 17500 *et seq.*;

6.    For attorneys' fees and costs incurred by Plaintiff in this action; and

7.    For an award of such other and further relief as the Court deems just and proper.

DATED:  April 21, 2025                GLASER WEIL FINK HOWARD
                                       JORDAN & SHAPIRO LLP

                                       By: _____
                                           JOSEPH LEVENTHAL
                                           MICHAEL CYPERS
                                           JULIE R.F. GERCHIK
                                           WOGAI MOHMAND
                                           *Attorneys for Plaintiff California New Car*
                                           *Dealers' Association*

24

**COMPLAINT**

3025922

# Exhibit A

# Reservation Agreement

This Reservation Agreement ("Agreement") governs the placing of a reservation ("Reservation") with Scout Motors Inc., 1775 Tysons Blvd, 5th Floor, McLean, VA 22102 ("Scout Motors") for a Scout Motors vehicle ("Scout vehicle"). Please carefully read this Agreement before submitting your Reservation. By submitting your Reservation, you agree to be legally bound by all terms of this Agreement.

## 1. Reservation Agreement

By this Agreement, together with your payment of the Reservation Fee, you are reserving a future purchase of your selected Scout vehicle. This Agreement does not obligate you to ever purchase a Scout vehicle, and it does not obligate Scout Motors to ever sell you a Scout vehicle. This Agreement is not a contract for the purchase, lease, or finance of a specific Scout vehicle that has already been manufactured and given a Vehicle Identification Number, and it does not lock in final pricing, a firm production slot, a firm delivery date, or specific configuration of a Scout vehicle.

After you submit your Reservation and the Scout vehicle you selected becomes available in production, we will invite you to complete the configuration of your Scout vehicle on our website. Once you have completed the configuration of your Scout vehicle, we will provide you with confirmation of your Scout vehicle configuration, and a detailed break-down of the approximate final price. To purchase the Scout vehicle you have selected and configured, you will need to execute Scout Motors' standard Agreement for Purchase or a lease agreement if Scout Motors is, at that time, offering leases to consumers in the state/province/territory in which you reside (collectively, "Final Sales Agreement") which will include additional terms and conditions, including the final purchase price for your Scout vehicle. Additional payments, including applicable taxes, other governmental fees, and/or shipping or destination charges, will be required as part of your final purchase of a Scout vehicle and will be reflected in your Final Sales Agreement.

By placing your Reservation, and thereby entering into this Agreement, you represent that you are at least 18 years of age or the legal age of majority in your state/province/territory (whichever is greater) and legally competent in the jurisdiction from which you are entering this Agreement to do so. If you are reserving a production slot for a Scout vehicle on behalf of a legal entity or organization, you further represent that you have actual authority to bind such legal entity or organization to this Agreement. We reserve the right to accept or decline Reservations in our sole discretion.

## 2. Reservation Fee

You will be charged a one-time fee of $100 USD or 150 CAD ("Reservation Fee") when you place your Reservation for a Scout vehicle. Placing a Reservation, which includes acceptance of this Agreement, constitutes your agreement to be charged the Reservation Fee using your provided payment method. The Reservation Fee is not a pre-payment or installment on the Scout vehicle that you may ultimately purchase, nor does the Reservation Fee guarantee the allocation of a Scout vehicle. All vehicle orders require an approved credit application and/or Final Sales Agreement to be completed prior to final delivery of the

vehicle. Failure to do so may result in the Reservation being canceled and the Reservation Fee being refunded.

You can cancel your Reservation at any time and receive a full refund of the Reservation Fee by sending an email from the email address that you used to make the Reservation to support@scoutmotors.com. If you ultimately execute a Final Sales Agreement and accept delivery of a Scout vehicle, we will provide a credit to the final price equivalent to the Reservation Fee.

## 3. Preliminary Price Estimate

Any pricing provided to you in advance of the Final Sales Agreement ("Preliminary Price Estimate") is only being offered to you as an estimate for illustrative purposes only, does not constitute an advertisement, solicitation, credit application, or offer for direct sale, financing, or leasing, and is subject to change. The Preliminary Price Estimate shown as part of your vehicle configuration might not include documentation fees, applicable taxes, government fees, and/or shipping or destination charges. Because such taxes, fees, and other costs are subject to change and will depend upon differing factors (such as where you choose to register the Scout vehicle), they will be calculated closer to the time of delivery and will be indicated on the Final Sales Agreement executed between you and Scout Motors.

The Preliminary Price Estimate does not reflect any changes that you may choose to make to the vehicle configuration. If you make changes to the vehicle configuration, you may be subject to potential price increases for any pricing adjustments made since your original Reservation. Any changes made to your vehicle configuration, including any changes in the method of delivery, delivery location, or estimated delivery date, will be reflected in a subsequent vehicle configuration or in the Final Sales Agreement.

You acknowledge that the estimated battery range and other available features, options, and accessories, and the pricing for them, may change before you execute the Final Sales Agreement. This means that your final price as will be reflected on the Final Sales Agreement could be higher than the Preliminary Price Estimate as a result of changes in the base price for the Scout vehicle or any of its features, options, or accessories, including, without limitation, model change-overs, increased labor or material costs, etc. Moreover, we reserve the right, in our sole discretion, to discontinue vehicle models, related products, features, options, and accessories and such discontinuance may result in changes to the final price as will be reflected on the Final Sales Agreement.

## 4. Delivery

Your priority in for the delivery of a Scout vehicle will be set, in part, by the date of payment of your Reservation Fee. The actual date of delivery will depend upon a variety of factors, including, among other things, your priority, our manufacturing schedule, your execution of the Final Sales Agreement, and the method and location of delivery of the Scout vehicle. There is no estimated or guaranteed delivery date based on your Reservation or this Agreement, nor does the Reservation Fee guarantee allocation of a Scout vehicle. Any estimated delivery time frames provided are estimates only provided for informational purposes, and are subject to change. While Scout makes every effort to provide accurate estimates, unforeseen circumstances including (but not limited to) production delays, transportation issues, or supply chain disruptions may impact the estimated delivery schedule. As such, you acknowledge and agree that Scout will not be liable to you for delays in delivery. The method of delivery of the Scout vehicle will be set out in the Final Sales Agreement.

## 5. Privacy Policy and Terms of Use

The information you provide with your Reservation will be used in accordance with our Privacy Policy and Terms of Use ("Privacy Policy"), each of which is incorporated herein by reference and available on our website scoutmotors.com/legal. Please read the Privacy Policy carefully to understand our practices regarding your information and how it will be treated.

## 6. Limitation of Liability

To the fullest extent permitted by law, you agree that we are not liable for any direct, special, consequential, punitive, indirect, or incidental damages of any kind whatsoever, including lost profits, loss of business or loss of opportunity, regardless of the basis or circumstances of any claim, damage, loss, or expense, whether in contract, tort, or otherwise. Your sole and exclusive remedy under this Agreement for any claims, damages, costs, or expenses arising under, out of, or related in any way to this Agreement and/or your Reservation is return of the Reservation Fee.

## 7. No Assignment or Re-Sellers

You may not assign your rights under this Agreement or your Reservation without our express, written consent. We reserve the right, in our sole and exclusive discretion, to cancel any reservation that we believe has been made with a view toward resale of any Scout vehicle or that has otherwise been made in bad faith.

Without limiting the generality of any other section of this Reservation Agreement, we reserve the right to limit or refuse any reservation you place with us. Further, we reserve the right to verify the validity of any reservation and/or cancel any reservation if we find evidence of fraud, tampering and/or any other violation of this Reservation Agreement. We may, in our sole and absolute discretion, limit or cancel the number of reservations submitted per person, or per household. These restrictions may include reservations placed by or under the same credit card, and/or reservations that use the same billing and/or delivery address.

All reservations are subject to verification by us at any time and for any reason. We reserve the right, in our sole and absolute discretion, to require proof of identity (in a form acceptable to us): (i) for the purposes of verifying the legitimacy of any reservation and/or other information; and/or (ii) for any other reason we deem necessary, in our sole and absolute discretion, for the purposes of fulfilling a reservation in accordance with our interpretation of the terms and conditions of this Reservation Agreement.

## 8. Governing Law

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND FOR CUSTOMERS WHO ARE NOT INDIVIDUALS RESIDING IN THE PROVINCE OF QUEBEC: This Agreement, and the Reservation, together with their formation and subject matter, and any related non-contractual disputes or claims between us, are governed solely by the laws of the state of Missouri, United States regardless of any conflict of laws principles. If you opt-out of the dispute resolution process described in Section 9, or otherwise believe that a dispute or claim is not subject to the terms of Section 9, you agree that any dispute or claim between you and Scout Motors shall be resolved in a state or federal court in the state of Missouri, United States. You expressly consent to the jurisdiction of such courts in the state of Missouri, United States and waive all objections to personal jurisdiction or as to venue in such courts due to lack of contacts, inconvenient forum, or any other basis.

FOR CUSTOMERS WHO ARE INDIVIDUALS RESIDING IN THE PROVINCE OF QUEBEC: This Agreement, and the Reservation, together with their formation and subject matter, and any related non-contractual disputes or claims between us, are governed solely by the laws of the Province of Quebec and the federal laws of Canada applicable therein, regardless of any conflict of laws principles.

## 9. Dispute Resolution

THIS SECTION 9 APPLIES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND DOES NOT APPLY TO INDIVIDUALS RESIDING IN THE PROVINCE OF QUEBEC. If you have a concern or dispute regarding the Reservation or this Agreement, please send written notice describing your dispute and your desired resolution to legal@scoutmotors.com. If your dispute is not resolved within 60 days of your email notice, you agree that any claim, controversy, or dispute arising out of or relating in any way to any aspect of the relationship between you and Scout Motors pursuant to the Reservation or this Agreement be resolved not in court by a judge or a jury, but instead only by and through the Better Business Bureau, Auto Line, as a

telecom binding arbitration under rules promulgated by the Better Business Bureau. Scout Motors will pay the fees associated with such binding arbitration. The arbitrator may only resolve disputes between you and Scout Motors related to, or arising out of, the Reservation and this Agreement and may not consolidate claims without the consent of all parties, including Scout Motors. Within 30 days of the Effective Date, you may opt out of binding arbitration through the Better Business Bureau, Auto Line, by sending a letter to 1775 Tysons Blvd, 5th Floor Floor, McLean, VA 22102 stating your name, Reservation confirmation number, and intent to opt out of this arbitration provision.

## 10. Class Action and Jury Trial Waivers

To the fullest extent permitted by applicable law (and except for individuals residing in the province of Quebec), no claim under this Agreement or related to the Reservation shall be joined to any other claim from other current or former users of our website or otherwise related to Scout vehicles or any other reservations. No claim brought under this Agreement shall proceed as a class action. You hereby waive any right to trial by jury in any action or proceeding arising out of or related to this Agreement, the Reservation, or any acts or omissions related thereto, whether now existing or hereafter arising or discovered, and whether sounding in contract, tort, or otherwise. You agree that we may file a copy of this Agreement with any court as written evidence of your knowing, voluntary, and bargained-for agreement to irrevocably waive trial by jury and that any action or proceeding whatsoever between us relating to these terms shall instead be tried in a court of competent jurisdiction by a judge sitting without a jury.

## 11. Effective Date

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW: This Agreement is effective upon Scout Motors' receipt of the Agreement and your payment of the Reservation Fee. Scout Motors receives and accepts the Agreement and payment of the Reservation Fee at its offices in Fairfax County, Virginia. By submitting the Agreement and paying the Reservation Fee, you agree that the Agreement is formed in the state of Missouri, United States.

**The undersigned have executed this Agreement effective as of the Effective Date.**

*[Electronic Signatures Via Website]*

# Exhibit B



Michael J. Stanton
President and CEO

March 6, 2025

Dr. Oliver Blume
Chairman of the Executive Board
Volkswagen Group
Berliner Ring 2
38440 Wolfsburg, Germany

Dear Dr. Blume:

I am writing to you on behalf of all the Volkswagen, Audi, and Porsche dealers in the United States.

The decision by you and your Board of Management to directly distribute Scout in the United States and compete with your dedicated dealer body is misguided, violates well-established state franchise laws, and is one that I strongly encourage you to revisit.

Since VW AG signaled the reemergence of the Scout brand in the U.S., NADA has communicated very clearly on numerous occasions with Scout and VW management that the franchise system is the best and most efficient way to deliver the customer experience that today's marketplace demands. This included a letter I sent directly to you in July 2023, to which I received no reply.

NADA fully stands behind VW, Audi, and Porsche dealers that are being left behind by this decision that violates protections provided by state law. Your U.S. dealers have always been trusted partners who have made significant investments and stood behind the brands – in good times, and bad, such as the Audi acceleration issue, the VW diesel emission scandal, and most recently the ID 4 quality challenges.

There have been several past examples of success by OEMs in the U.S. launching a new brand and using a selected subset of their existing dealer networks for distribution. On behalf of your U.S. dealers, we request a meeting with you at your earliest possible convenience to discuss alternatives to this direct distribution approach. We can either meet at your office in Wolfsburg, my office in Washington, or somewhere in between.

The dealership franchise system is a proven model of success and would allow the Scout brand immediate traction in our competitive marketplace. The alternative is continued strain on the relationship with your U.S. dealers and unnecessary, state-by-state, protracted legal challenges.

I look forward to hearing from you soon.

Regards,

Mike Stanton

Page -2 -

cc:     Automotive Trade Association Executives
        Kjell Gruner, President and CEO, Volkswagen Group of America
        Scott Keogh, President and CEO, Scout Motors
        Timo Resch, President and CEO, Porsche Cars North America
        Andrew Savvas, Chief Sales and Marketing Officer, Volkswagen of America
        Daniel Weissland, President, Audi of America
        U.S. Volkswagen, Audi, and Porsche Dealers

# Exhibit C

STATE CAPITOL
P.O. BOX 942849
SACRAMENTO, CA 94249-0004
(916) 319-2004

E-MAIL
Assemblymember.Aguiar-Curry@assembly.ca.gov

WEBSITE
a04.asmdc.org

**Assembly
California Legislature**

DISTRICT OFFICES:
600 A STREET, SUITE D
DAVIS, CA 95616
(530) 757-1034

2721 NAPA VALLEY CORPORATE DRIVE
NAPA, CA 94558
(707) 224-0440

**CECILIA M. AGUIAR-CURRY**
MAJORITY LEADER
ASSEMBLYMEMBER, FOURTH DISTRICT

VIA E-MAIL AND FIRST-CLASS MAIL

February 06, 2025

Neil Sitron, Esq.
General Counsel
Scout Motors Inc.
1775 Tysons Blvd
McLean, VA 22102
neil.sitron@scoutmotors.com

Antony Klapper, Esq.
Senior Vice President and General Counsel
Volkswagen Group of America Inc.
1950 Opportunity Way
Reston, VA 20190
antony.klapper@vw.com

**Re: Volkswagen Group of America's and Scout Motors Inc.'s Violation of AB 473 (Aguiar-Curry, Chapter 332, Statutes of 2023)**

Dear Messrs. Sitron and Klapper:

I write to you in my capacity as the Majority Leader of the California State Assembly and as the author of Assembly Bill 473 ("AB 473"), which was enacted to protect dealers from adverse treatment from their manufacturer partners, including unfair competition. My office has been informed that Volkswagen Group of America Inc. ("VW") and its affiliate, Scout Motors Inc. ("Scout"), are planning to compete with existing California VW franchisees by selling Scout vehicles directly to California consumers. This plan blatantly disregards the requirements and intent of AB 473.

AB 473, which took effect on January 1, 2024, amended Vehicle Code section 11713.3(o) to prevent an automaker from circumventing its existing dealer network by creating an affiliate brand that directly sells and services vehicles with consumers. In my legislation, we took particular care to ensure that while new brands could enter the market, automakers with existing franchise operations in California—like VW—would not be permitted to circumvent their established franchised dealers through affiliate brands like Scout.

During the legislative process for AB 473, Scout Motors raised concerns that the bill could prevent it from selling its vehicles in California entirely. In response to this legitimate concern, I amended AB 473 to allow existing franchisees like VW to establish new brands like Scout, so long as they use new or existing independent franchisees to sell and service their vehicles. Despite these amendments, which were in response to feedback from VW and Scout's advocates here in Sacramento, it now appears both companies are proceeding with a sales approach that contravenes our carefully crafted statutory language.

I have been informed that VW and Scout have begun accepting deposits for Scout vehicles directly from California residents, excluding existing or future franchised dealers from the sales and service process. Such practices violate Vehicle Code section 11713.3(o), as amended by AB 473, which expressly forbids an automaker from competing with its own dealers through an affiliate brand.

California's franchised dealerships—and the consumers they serve—stand to suffer harm from Scout's stated distribution model. Franchised dealerships provide not only sales but also local maintenance and warranty services, fueling vital economic activity throughout the state. Scout's stated plan erodes these consumer protections, eliminates local business opportunities, and disregards the clear legislative language and my intent of AB 473.

As the Assembly Majority Leader and author of AB 473, I'm asking you to reconsider Scout's distribution, sales, and service plans and ensure that Scout's practices comply with the law. VW has been a longstanding partner to its dealers throughout California. I hope that it will continue this constructive partnership with local businesses, as the investments made by independent franchisees promote safety are vital to the economic health of our communities.

Please confirm receipt of this letter and outline your efforts to comply with AB 473. If you have any questions or wish to discuss this matter further, you may contact my Legislative Director Marika Nell at marika.nell@asm.ca.gov or (916) 319-2004.

Thank you for your immediate attention to this critical matter.

Sincerely,

CECILIA AGUIAR-CURRY
Assembly Majority Leader
California State Assembly, District 4

cc:
Rob Bonta, Attorney General of California
Steve Gordon, Director of the California Department of Motor Vehicles