JOSEPH LEVENTHAL - State Bar No. 221043
jleventhal@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
600 West Broadway, Suite 2850
San Diego, California 92101
Telephone:  (619) 765-4380

MICHAEL CYPERS - State Bar No. 100641
mcypers@glaserweil.com
JULIE R.F. GERCHIK - State Bar No. 237764
jgerchik@glaserweil.com
WOGAI MOHMAND - State Bar No. 328812
wmohmand@glaserweil.com
GLASER WEIL FINK HOWARD
  JORDAN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff
California New Car Dealers Association

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA NEW CAR DEALERS ASSOCIATION, a non-profit trade association,<br><br>              Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, VOLKSWAGEN AG, a publicly traded German corporation, SCOUT MOTORS, INC., a limited liability company, and SCOUT MOTORS SALES LLC, a Delaware corporation,<br><br>              Defendants. | Case No.: 3:25-CV-01316-BAS-DEB<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1. UNFAIR COMPETITION [BUSINESS AND PROFESSIONS CODE SECTION 17200]**<br><br>**2. FALSE ADVERTISING [BUSINESS AND PROFESSIONS CODE SECTION 17500]** |

1

**FIRST AMENDED COMPLAINT**

3091323

Plaintiff California New Car Dealers Association ("CNCDA" or "Plaintiff") hereby files this First Amended Complaint for (1) Unfair Competition, under Business and Professions Code section 17200 *et seq.* and (2) False Advertising, under Business and Professions Code section 17500 *et seq.* against Defendants Volkswagen Group of America, Inc. ("VWGoA"), Volkswagen AG ("VWAG"), (collectively VWGoA and VWAG, are referred to as "VW"), Scout Motors, Inc. ("Scout Motors"), and Scout Motors Sales LLC ("Scout Sales") (VWAG, VWGoA, Scout Motors, and Scout Sales are collectively referred to as "Defendants"), and hereby alleges as follows:

## INTRODUCTION

1.      VWAG, a multinational corporation, is spending hundreds of millions of dollars to knowingly violate California law. Together with Scout Motors and Scout Sales, VWAG and VWGoA have taken the extraordinary step of defying the California Legislature – and their own dealers – to market and sell their Scout electric and gasoline-powered vehicles directly to California consumers. Defendants' actions are in direct contravention of AB 473 and decades of California legislation designed to promote competition in the automobile industry. VWAG, VWGoA, Scout Motors, and Scout Sales should be immediately prohibited from their direct to consumer sales in California.

2.      In or about 2022, Volkswagen AG, consisting of the global headquarters of Volkswagen in Germany and including its many arms in the United States, acquired and resuscitated an existing brand named Scout Motors. At the time, Scout Motors was in the process of designing sports utility vehicles and trucks and its vehicles were yet to be rolled out.

3.      For decades, California law has flatly forbidden an automobile manufacturer from competing with its auto dealerships in the same line-make of vehicles or "brand" due to the tremendous economic disparity between the manufacturer and dealer. However, in 2023, auto industry participants recognized that

**FIRST AMENDED COMPLAINT**

3091323

under existing law, automobile manufacturers could compete indirectly with their dealers by setting up an affiliated brand with a different name. As a response to this concern, the California Legislature introduced AB 473.

4.      Scout Motors immediately opposed AB 473 because it changed California's dealer franchise law to prevent franchisors (e.g., VWAG and VWGoA) from using affiliates (e.g., Scout Motors and Scout Sales) to compete indirectly with their dealers in the sale and service of motor vehicles. In fact, Scout Motors explicitly and repeatedly urged the California Legislature to carve out exceptions for its intended direct-to-consumer sales model that would bypass VW franchisee dealerships. In response to Scout Motors' concerns, the California Legislature made an accommodation for Scout Motors. Consistent with the goal of promoting fair competition, AB 473 was amended so that affiliate brands (e.g., Scout Motors and Scout Sales) can be created or used by franchisors (e.g., VWAG and VWGoA), **but are required to use franchisees to sell and service motor vehicles**. Thus, Scout Motors could sell its vehicles in California as long as it used new or existing VW-affiliated franchisees to sell those vehicles. This accommodation also extended to other automobile manufacturers. Importantly, however, under AB 473, new and existing franchises would not face indirect competition by an affiliate of their own automobile manufacturer. Instead, they would compete with other franchisees on a level playing field.

5.      Even with these amendments, Scout Motors' General Counsel Neil Sitron told the California Legislature that if the bill were enacted as amended, it could effectively "kill[] off" any opportunity for Scout Motors to sell its vehicles directly to California consumers. *See* August 21, 2023, Letter from Neil Sitron to California Legislature, "*Oppose Unless Amended*…".

6.      On September 11, 2023, the California Legislature passed AB 473. The bill passed unanimously and was signed into law by Governor Newsom on October 7, 2023.

3

**FIRST AMENDED COMPLAINT**

3091323

7. In direct contravention of California law, Scout Motors, Scout Sales, VWAG, and VWGoA have moved forward with their original plan and are bypassing their VW-affiliated dealers entirely. Specifically, Scout Motors has entered into deposit agreements with California consumers through which Scout Motors takes $100 deposits for Scout vehicles directly from California consumers through Scout Motors' website. Scout Motors, Scout Sales, VWAG, and VWGoA are further bypassing their California VW franchisee dealers by engaging in direct marketing of their vehicles, which historically was done in partnership with local dealerships.

8. Under Defendants' illegal direct-to-consumer sales model, California VWGoA dealers are deprived of the opportunity to sell highly desirable Scout Motors vehicles, resulting in significant financial losses to CNCDA's members—including, but not limited to, loss of livelihood for the dealers, loss of jobs for the employees who work at dealerships (which are one of California's largest employers and generators of sales tax revenue), and lost investment in the dealership showrooms.

9. Defendants are knowingly and intentionally violating California law. In direct contravention of AB 473 and its prohibition on a vehicle manufacturer competing with its dealer network through an affiliate brand, Scout Motors has engaged and is now engaging in direct-to-consumer sales and marketing—thereby openly competing with their own dealers. Indeed, **Scout Motors has accepted over 50,000 reservations and deposits directly from consumers for its vehicles**. Defendants must not be permitted to continue to disregard California law to the serious detriment of their dealers and the related economy. Defendants are actively competing against VWGoA franchisee dealers in California and damaging such dealers as alleged herein.

## THE PARTIES

10. Plaintiff CNCDA is a statewide trade association that represents the interests of more than 1,400 franchised new car and truck dealer members and has pushed the auto industry forward for over 100 years.

**FIRST AMENDED COMPLAINT**

3091323

11.    CNCDA's organizational purpose is to protect the interests of its franchised dealers. CNCDA advocates for franchised dealers through lobbying the legislature and regulatory agencies on behalf of its members, provides guidance on issues directly impacting franchises, defends against excessive regulations while promoting implementation and enforcement of fair and reasonable government rules, and ensures a healthy business climate for dealer operations.

12.    CNCDA members engage in the retail sale and lease of new vehicles and also engage in automative service, repair, and parts sales.

13.    CNCDA member dealers' total sales in California reached $154 billion in 2024, selling approximately 1.76 million new cars and accounting for 21% of the total California statewide sales tax collected.

14.    CNCDA member dealerships provide a substantial number of jobs in California. As of 2024, CNCDA members provided 138,478 jobs in the state of California and had a total employee payroll of $14.64 billion.

15.    In 2024, CNCDA member dealerships paid approximately $13.8 billion in state and federal taxes. In the same year, CNCDA member dealerships spent approximately $3.5 billion on products and services from other California businesses.

16.    In 2024, CNCDA member dealerships paid approximately $1.28 billion in advertising expenditures.

17.    In 2024, CNCDA member dealerships spent approximately $70.75 million on charitable and civic organizations.

18.    CNCDA's members include VWGoA franchised dealers who, due to Scout Motors' unlawful direct-to-consumer sales, are now in direct competition with a VWAG affiliate that is selling and servicing vehicles directly to consumers in a sales and marketing program approved by VWAG executives at the highest level.

19.    CNCDA members who conduct business under written franchise agreements with VWGoA, doing business as Volkswagen of America, Inc., have a strong interest in knowing whether Scout Motors' direct-to-consumer sales are a

**FIRST AMENDED COMPLAINT**

3091323

violation of the Vehicle Code. This is especially true since VWAG, through Scout Motors, insists on moving forward with its direct-to-consumer model and VWAG executives have stated that Scout Motors has accepted over 50,000 reservations and deposits in the United States for its vehicles.

20. Absent an adjudication of the merits of this lawsuit, Defendants' business practices will continue to undermine both long-standing and recently passed California laws meant to protect dealers and consumers under the Vehicle Code by unlawfully allowing VWAG to compete with its VWGoA franchisee dealer network for vehicle sales indirectly through its affiliate Scout Motors.

21. CNCDA has standing to assert its claims for violation of the Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, and the False Advertising Law, Business and Professions Code section 17500 *et seq.* The interests CNCDA seeks to protect are germane to its purpose, which is the promotion of a legal and regulatory climate conducive to a robust business environment for California's car dealers, compliance with applicable law, protection of its members from illegal conduct, and clarification of legal and regulatory mandates.

22. CNCDA represents the association's members, a readily identifiable group. Additionally, CNCDA (and its members) has an interest in the questions of law and fact in this lawsuit because a resolution of this suit will involve: (a) a determination of Defendants' rights and duties under the Vehicle Code with respect to the program of direct sales of Scout Motors vehicles to California consumers; (b) enforcement of California franchise laws; and (c) the elimination of any ambiguity regarding these matters to help guide the conduct of all interested parties in accordance with the law.

23. CNCDA has suffered injury in fact as a result of Defendants' unfair competition because CNCDA was forced to divert organizational resources to investigate Defendants' direct-to-consumer sales model and attempt to enforce the Vehicle Code.

**FIRST AMENDED COMPLAINT**

3091323

24. CNCDA has suffered injury in fact as a result of Scout Motors' false advertising because CNCDA was forced to divert organizational resources to investigate Defendants' direct-to-consumer sales model and related advertisements, and attempt to enforce the Vehicle Code.

25. Defendant Volkswagen Group of America, Inc. ("VWGoA") is a New Jersey corporation with its principal place of business in Reston, Virginia. On information and belief, VWGoA has an equity interest directly or indirectly controlled or owned by Volkswagen AG, who also directly or indirectly owns an equity interest of Scout Motors.

26. Defendant Volkswagen AG, also known as Volkswagen Group, ("VWAG") is a German public multinational manufacturer of vehicles with its principal place of business in Wolfsburg, Germany. VWAG sells cars under several brands, including but not limited to Audi, Porsche, Škoda, and Volkswagen.

27. Defendant Scout Motors, Inc. ("Scout Motors") is a Delaware corporation with its principal place of business in McLean, Virgina. Scout Motors is an American automotive company that is wholly owned by Volkswagen AG, which obtained the Scout brand after acquiring American truck manufacturer Navistar International in 2021.

28. Defendant Scout Motors Sales LLC ("Scout Sales") is a Delaware limited liability company with its principal place of business in McLean, Virginia. Scout Sales is qualified to do business in California through a California Department of Motor Vehicle dealer license that is registered in Fremont, California. On information and belief, Scout Sales is a wholly owned direct subsidiary of Scout Motors, and therefore a 100% indirect subsidiary of Volkswagen AG.

## JURISDICTION AND VENUE

29. This Court has jurisdiction to hear the subject matter of this complaint as the conduct that is complained of herein took place in this state.

30. This Court has jurisdiction over Defendants in this action because each

**FIRST AMENDED COMPLAINT**

3091323

of the Defendants have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, Defendants' agents, or Defendants' personal representatives purposefully directed activities at, or availed themselves of, the forum state in such a significant manner that Defendants could reasonably anticipate being haled into court here, as evidenced by the fact that Defendant Scout Motors has accepted deposits for its vehicles from California residents in contracts that expressly state that they are binding. On information and belief, in order for a consumer to buy or lease a Scout vehicle, the consumer must have (1) signed a Reservation Agreement with Scout Motors and (2) paid Scout Motors a financial deposit. In addition, Defendant Scout Motors has directed its marketing activities towards California residents, and Scout Motors has announced its intention to open Scout Motors stores and service centers in 16 major markets, including in San Diego, California. On information and belief, VWAG has directed and influenced material activities of Scout Motors such that it has availed itself of jurisdiction. VWGoA operates in California by entering into franchise agreements with dealerships, whom are members of Plaintiff CNCDA, to lease, sell, and service VWAG-branded vehicles.

31. As alleged in greater detail herein, VWAG purposely and deliberately: (a) markets vehicles in the United States manufactured by VWAG, including in California, through VWGoA and hundreds of dealers in the United States, including dealers located in California who are members of CNCDA, (b) employs a calculated strategy to maximize penetration of United States markets, including California, by VW-manufactured electric vehicles ("EVs"), and (c) regularly discloses and explains its sales strategies and goals in the Unites States, including California, to key players in the United States financial markets such as United States-headquartered banks and other investors.

32. Venue is proper in this judicial district against each Defendant because, on information and belief, Defendants have committed wrongful acts in this judicial

**FIRST AMENDED COMPLAINT**

district, including by taking $100 deposits from consumers in this judicial district or by directing marketing materials to solicit direct sales to consumers who reside in this district, and Defendants have declared their intention to open a storefront in this judicial district to sell, service, lease, or repair Scout Motors vehicles directly to consumers.

## STATEMENT OF FACTS

### *History and Purpose of California Auto Dealer Franchise System*

33.   The auto dealer franchise system was originally developed by manufacturers as a cost-effective way to expand into local markets and tap into a franchise dealers' resources and the dealers' superior knowledge about those local markets.

34.   Over time, dealers realized they were largely at the mercy of manufacturers, despite dealers' large investments (both time and money) in infrastructure in order to sell their vehicles. Manufacturers had the power to replace their dealers, could refuse to allocate popular inventory to the dealers, or would open nearby competing dealerships. The relationship between manufacturers and their dealers was inherently asymmetrical, leaving dealers at the mercy of their manufacturers.

35.   In response to the significant disparity in economic power, dealers prevailed upon their local regulators to enact legislation governing the relationship between dealers and the manufacturers in order to promote fair competition. In 1972, the California Legislature passed the Automobile Franchise Act (the "Act") "'in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor'" (among other reasons). *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.* ("*Fox*"), 439 U.S. 96, 101, fn. 6 (1978) (citing Historical and Statutory Notes for Vehicle Code).

36.   The franchise laws are designed to prevent predatory practices by manufacturers such as forcing dealerships to accept unwanted deliveries of cars and

**FIRST AMENDED COMPLAINT**

3091323

requiring "line-make"[1] franchise dealerships to incur unnecessary advertising expenses. *Fox*, 439 U.S. at 100-101 ("disparity in bargaining power between automobile manufacturers and their dealers prompted Congress and some States to enact legislation to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers."); *see also Tober Foreign Motors v. Reiter Oldsmobile*, 381 N.E.2d 908, 914 (Mass. 1978); Stephen M. Fox, *Two Roads Diverged: Tesla, Interruption, and the Commerce Clause*, 22 B.U. J. Sci. & Tech. L. 153, 155 (2016).

37.     Notably, the United States Supreme Court stated: "the California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices," making it clear that the Vehicle Code's framework around franchises is focused on promoting fair competition. *Fox*, 439 U.S. at 107; *see also Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp., U.S.A.*, 221 Cal. App. 4th 867, 877 (2013) (noting that some 25 states have enacted legislation to protect dealers from "abusive and oppressive acts by the manufacturers.").

***The California Vehicle Code and its 2023 Amendments***

38.     Vehicle Code Section 285 defines a "dealer" as an entity that sells vehicles required to be registered under the Vehicle Code. Section 286 excludes from that definition several classes of individuals and entities. More plainly, dealers are car dealerships. CNCDA's members consist of franchised new car dealers.

39.     Vehicle Code Section 672 defines a "vehicle manufacturer" (the Vehicle Code defines the term as "vehicle manufacturer" in Section 672 but elsewhere omits the word vehicle and refers only to a "manufacturer") as "any person who produces from raw materials or new basic components a vehicle of a type subject to registration

---

[1] "Line-make" means a group or series of motor vehicles that have the same brand identification or brand name, based upon the manufacturer's trademark, trade name, or logo.

**FIRST AMENDED COMPLAINT**

3091323

under this code, off-highway motorcycles or all-terrain vehicles subject to identification under this code[.]" Cal. Veh. Code § 672(a). Defendant VWGoA is licensed as a manufacturer.

40.    Vehicle Code Section 296 defines a "distributor" as "any person other than a manufacturer who sells or distributes new vehicles subject to registration under this code … to dealers in this state and maintains representatives for the purpose of contacting dealers or prospective dealers in this state." Cal. Veh. Code § 296. In other words, a distributor is an entity that acts as an intermediary between the manufacturer who builds the vehicles, and the dealers (i.e. car dealerships) that sell them. Defendant VWGoA is licensed as a distributor.

41.    Under Vehicle Code section 331, a "franchise" is defined as follows:

(a) A "franchise" is a written agreement between two or more persons having all of the following conditions:

(1) A commercial relationship of definite duration or continuing indefinite duration.

(2) The franchisee is granted the right to offer for sale or lease, or to sell or lease at retail new motor vehicles or new trailers subject to identification pursuant to Section 5014.1 manufactured or distributed by the franchisor or the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities.

(3) The franchisee constitutes a component of the franchisor's distribution system.

(4) The operation of the franchisee's business is substantially associated with the franchisor's trademark, trade name, advertising, or other commercial symbol designating the franchisor.

(5) The operation of a portion of the franchisee's business is substantially reliant on the franchisor for a

**FIRST AMENDED COMPLAINT**

3091323

continued supply of new vehicles, parts, or accessories.

42.    Under Vehicle Code section 331.1, a "franchisee" is defined as:

"any person who, pursuant to a franchise, receives new motor vehicles subject to registration under this code…from the franchisor and who offers for sale or lease, or sells or leases the vehicles at retail or is granted the right to perform authorized warranty repairs and service, or the right to perform any combination of these activities."

43.    Under Vehicle Code section 331.2, a "franchisor" is defined as "any person who manufactures, assembles, or distributes new motor vehicles subject to registration under this code."

44.    Under Vehicle Code section 11713.3(z), an "affiliate" is defined as:

"a person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under the common direction and control with, another person. 'Control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any person."

By these definitions, Defendant Scout Motors (and by extension Scout Sales, as its subsidiary) is an affiliate of Defendant VWGoA because both are under common control by VWAG.

45.    Under the Vehicle Code's definitions, dealers selling VW-branded vehicles are franchisees of VWGoA – a franchisor – that operate under franchise agreements in order to sell, service, and repair VW-branded vehicles. Scout Motors is an affiliate of VWGoA because it is wholly owned by VWAG and is under the "common direction and control" of VWAG.

46.    Prior to AB 473, Vehicle Code section 11713.3 made it:

"unlawful and a violation…for a **manufacturer, manufacturer branch, distributor, or distributor**

**FIRST AMENDED COMPLAINT**

3091323

> **branch**….[t]o compete with a dealer in the **<u>same line-make</u>** operating under an agreement or franchise from a manufacturer or distributor in the relevant market area."

(emphases added). The prior version of the law did not expressly prevent franchisors – i.e. vehicle manufacturers – from using affiliates to compete with their own dealer franchises in the sale and service of motor vehicles. This created a gap in the law that vehicle manufacturers could exploit to compete with their own franchised dealer network.

47.    The pre-AB 473 version of the statute did not prevent VWGoA's parent, VWAG, from simply creating a new entity with a different brand name to compete with VWGoA's California franchisees. This gap would have allowed automakers like VWAG to create new subsidiaries that would distribute vehicles directly to consumers, thereby cutting franchised dealers out entirely.

48.    In 2023, CNCDA sponsored AB 473 in the California Legislature in order to "strengthen and update California's franchise laws to create a stronger and more equitable vehicle franchise system for our members."[2] One of the main purposes of AB 473 was to "[p]rotect the underlying intent of the vehicle franchise system by precluding **manufacturers** from launching **a new brand name of vehicles** as a way that **would compete directly with their franchised dealer network**."[3] (emphasis added). The amendments were focused on promoting fair competition among franchisees by preventing vehicle manufacturers from competing directly or indirectly through an affiliate brand with their own franchised dealer networks.

49.    During the legislative process of AB 473, Scout Motors was vocal in its opposition to the law. In materials for the Assembly Committee on Transportation,

---

[2] SUPPORT AB 473: CNCDA's 2023 Franchise Bill, https://www.cncda.org/advocacy/ab-473/.

[3] *Id.*

**FIRST AMENDED COMPLAINT**

the Committee noted:

> "Scout Motors is opposing the bill, arguing the anti-competition language in the bill 'would serve to prohibit Scout Motors (or any other new-to-the-market manufacturer would be statutorily banned from using newly appointed intendent dealers, using existing independent dealers, or selling direct to California in any affiliate of such manufacturer were selling motor vehicles.'
>
> **To address this concern the author amended the bill to permit competition so long as the vehicle is being sold *using new or existing franchisees* to sell and service those vehicles.** It would still prohibit Scout Motors or any new vehicle line from a manufacturer with a dealership network in California from being sold directly to customers. **Volkswagen, the parent company of Scout Motors, could sell Scout vehicles in the state if they sell them at any of their other vehicle line company's dealerships like Volkswagen, Audi, Porsche, Bentley or Lamborghini. Volkswagen Group could also create a new franchise network for Scout Motors if they want to keep a separate brand distinct from their other models.** This provision would not affect Tesla, which does not have a dealership network to directly compete against." (emphasis added).

50.    Scout Motors also formally proposed edits to the language of AB 473 that would specifically carve out an exception for when vehicle manufacturers "creat[e] a new line of motor vehicles that are exclusively battery electric vehicles that are manufactured in the United States." Scout Motors' suggestion was rejected.

51.    Scout Motors also attempted to carve out another exception solely for its benefit by proposing that certain affiliates be excluded from the law until 2029. This proposal had no public policy rationale and was also rejected.

52.    On August 21, 2023, Scout Motors' General Counsel Neil Sitron wrote to the California Legislature stating that if AB 473 was passed as amended, **it could prohibit Scout Motors from "sell[ing] its vehicles directly to California**

**FIRST AMENDED COMPLAINT**

3091323

**consumers."** *See* August 21, 2023, Letter from Neil Sitron to California Legislature, "*Oppose Unless Amended…*" (emphasis added). Indeed, in Mr. Sitron's letter to California Senate President Toni Atkins and Appropriations Chairman Anthony Portantino, **Scout Motors' General Counsel stated that he understood that under the amended version of AB 473, Scout would not be able to bypass VW's dealers, and instead would be required to respect California's time-honored position that manufacturers are forbidden from competing with their dealers.** *Id.* (Mr. Sitron wrote: "Under [AB 473's] language… [a manufacturer] would be statutorily banned from deciding its distribution model in California…"). **Mr. Sitron admitted during the legislative enactment process of AB 473 that the amended law would "kill[] off" any opportunity for Scout Motors to sell its vehicles directly to California consumers**. *Id*. (emphasis added).

53.    Scout Motors' suggestions were rejected, and AB 473 (which took effect on January 1, 2024) amended Vehicle Code section 11713.3(o) to prevent an automaker from circumventing its existing franchised dealer network by creating an affiliate brand that competes with existing dealer franchisees by selling and leasing vehicles directly to consumers and servicing such vehicles. The proposed amendments to the legislation were designed to ensure that while new brands could enter the market, existing franchise operations in California—like that of VWAG and its subsidiaries including VWGoA—would not be permitted to circumvent their established franchised dealers through affiliate brands like Scout Motors. The additions to the legislation state that:

> "It is unlawful and a violation of this code for a manufacturer, manufacturer branch, distributor, or distributor branch licensed pursuant to this code to do, **directly or indirectly through an affiliate**, any of the following:

//

---

15

**FIRST AMENDED COMPLAINT**

3091323

(o)(1) **To compete with their franchisees in the sale, lease, or warranty service of new motor vehicles."** (emphases added).

54.    The amendments to AB 473 therefore allow franchisors, like VWAG and its subsidiaries including VWGoA, to use affiliates to sell vehicles, but only if the affiliates sell those vehicles using new or existing VW franchisees. The California Legislature was clear when it passed the law (and rejected Scout Motors' proposals) that it intended to address the asymmetrical relationship between franchisors and franchisees, promote fair competition, and increase equity in franchises.

55.    Defendants' ongoing program of Scout Motors (which is an affiliate of VWGoA under the Vehicle Code) selling vehicles directly to consumers is prohibited by the Vehicle Code because it cuts out the VWGoA dealers as the franchisees.

56.    AB 473 expressly contemplates automakers, such as VWAG, selling or leasing vehicles through affiliates, such as Scout Motors. This is highlighted by the exception in Vehicle Code section 11713.3(o)(4)(B), which states:

> "a manufacturer, manufacturer branch, distributor, or distributor branch, or an affiliate thereof, shall not be deemed to be competing with their franchisees in any of the following limited circumstances….**When creating a new line of motor vehicles and using new or existing franchisees to sell and service those vehicles**." (emphasis added).

In other words, the affiliates of a distributor/franchisor like VWAG or VWGoA may create, market, and sell a new brand of vehicles, but only if they sell those vehicles using new or existing VW franchisees.

57.    The amendments to the Vehicle Code contained in AB 473 were intended to close the gap in the Vehicle Code whereby an automaker could create new affiliated entities to compete with its franchisees. In other words, AB 473 was intended to prevent two distinct scenarios that would circumvent the intention of the

**FIRST AMENDED COMPLAINT**

3091323

Vehicle Code and put franchisees at a disadvantage. First, AB 473 prevents the straightforward situation where a manufacturer/distributor such as VWGoA competes with its franchisees by creating an affiliate that VWGoA controls. Secondly, AB 473 also makes it illegal for VWGoA's parent, VWAG, to create a new entity that is not under control of VWGoA that nonetheless competes directly with VWGoA's franchisees. This second scenario is exactly the situation presented here: VWAG revived the Scout brand, invested heavily into it, and is directing Scout Motors to compete with VWGoA's franchised dealers by selling vehicles directly to consumers.

58.    This regime contrasts with the prior iteration of Section 11713.3 which only prohibited manufacturers and distributors (but made no mention of their affiliates) from competing with franchisees in the same line-make.

***VWAG's Clear Involvement in Scout Motors***

59.    Senior executives of VWAG, including its Chief Executive Officer Oliver Blume and Finance Director and Chief Operating Officer Arno Antlitz, have made repeated public statements concerning the business and strategic role of Scout Motors in the broader VWAG business plan and automobile portfolio. These statements were made during press interviews, earnings calls, and other venues explicitly aimed at investors and market participants, with the clear understanding that their content would be publicized and acted upon in U.S. financial markets.

60.    For example, in its 2024 Annual Report, VWAG stated:

> "Under the Volkswagen Group's North American strategy, **Scout Motors Inc., Tysons/USA, a wholly owned subsidiary in the Volkswagen Group**, was established in Fiscal Year 2022…In order to finance the creation of the Scout brand, as well as vehicle development and production planning, an amount of USD 493 million was contributed to the company in fiscal year 2023."

(emphasis added). The report also stated: "The company [Scout Motors] has been included in the Volkswagen consolidated financial statements since January 1, 2023."

Glaser Weil

**FIRST AMENDED COMPLAINT**

3091323

61.    The 2024 Annual Report also noted that:

"In fiscal year 2024, Volkswagen AG acquired the shares of Scout Motors Inc., Tysons/USA, from Volkswagen Finance Luxemburg for €0.6 billion. To finance the restructuring under company law of the Volkswagen financial services companies, Volkswagen AG made a contribution of €250 million to the share capital and a contribution of €277 million to other capital reserves of Volkswagen Financial Services AG, Braunschweig, in the reporting year."

62.    In the "Investment and Financial Planning" section of the 2024 Annual Report, VWAG states:

"To meet people's needs for individual, sustainable, fully connected mobility and thus increase the **Volkswagen Group's future viability, we continue to mobilize our strengths in innovation and technology and push Volkswagen's transformation towards becoming a global automotive tech driver.**"

(emphasis added). The report continues:

"Other focus areas of our capex [capital expenses] are the digitalization of our products and sites, measures to cut carbon emissions, the promotion of sustainable production processes, and the **expansion of our presence in markets such as North America (with the Scout brand)** and China, where we will likewise step up our activities at local level." (emphasis added).

63.    VWAG is clear in its intent to utilize Scout Motors to expand its foothold in North America, explicitly stating in its 2024 Annual Report that "[b]y developing and producing a full-size pick-up and a robust SUV, the **Volkswagen Group plans to tap into the electric vehicle market with the US brand icon Scout**." (emphasis added).

64.    On or around January 7, 2025, Oliver Blume, the Chief Executive

**FIRST AMENDED COMPLAINT**

3091323

Officer of VWAG – not the CEO of Scout Motors – announced that Scout Motors had received more than 50,000 reservations and deposits for Scout Motors' vehicles, demonstrating VWAG's clear involvement in and knowledge of Scout Motors' operations and business.[4]

65.     VWAG's executives describe Scout as a central component of VWAG's EV strategy, specifically portraying Scout Motors vehicles as a "step[] to plug Volkswagen's portfolio gaps."[5] For example, a Bloomberg article titled "VW Braces for Another Tricky Year With No New EVs"[6] states that the "German automaker's namesake brand is struggling in the US and China because of a patchy offering" and that "voids in VW's lineup are complicating Chief Executive Offer Oliver Blume's bid to restructure the industrial behemoth, which is reeling from overcapacity and intensifying competition" primarily because the "namesake VW brand doesn't have a new electric car coming in 2025." VWAG's key new models are presented in the Bloomberg article through the below graph:

---

[4] Michael Wayland, "VW's Scout has more than 50,000 reservations for upcoming EVs as automaker aims to grow U.S. share," Jan. 8, 2025, https://www.cnbc.com/2025/01/08/scout-motors-electric-vehicles-ev-reservations.html.

[5] Monica Raymunt, "VW Braces for Another Tricky Year With No New EVs," Jan. 14, 2025. https://www.bloomberg.com/news/articles/2025-01-15/volkswagen-faces-tough-2025-as-it-struggles-to-compete-with-china-s-byd-xiaomi.

[6] Id.

**FIRST AMENDED COMPLAINT**

**Volkswagen's Key New Models Won't Arrive Until Next Year**

| Model | Market Launch | Starting Price | Notes |
|---|---|---|---|
| VW ID.3 | Sept. 2020 | €33,330 | Unveiled in 2019, the hatchback was VW's first proper electric car; it's still on sale. |
| VW ID.4 | Late 2020 | €40,335 | The crossover SUV has been updated since its launch, including with a more efficient electric motor. |
| VW ID.7 | Sept. 2023 | €54,000 | VW has cut the starting price of its flagship electric sedan to bolster sales. |
| VW ID. 2all | 2026 | <€25,000 | VW's affordable entry-level EV is to be produced in Spain where labor and energy costs are lower. |
| VW-Xpeng SUV | 2026 | Unknown | First model of VW's partnership meant to improve sales in China will be produced in Anhui province. |
| Scout Traveler, Terra | 2027 | $60,000 | The Traveler SUV and Terra pickup will be offered as plug-in hybrid as well as battery-only versions. |
| VW ID. Golf | 2029 | Unknown | The all-electric version of the iconic hatchback has been delayed due to development issues with VW's next generation EV platform. |

(highlighting added). VWAG has thus presented its EV lineup to the public and the automotive and financial markets in a manner that includes Scout Motors among its core EV models. On information and belief, these representations have led the automotive and financial markets to view Scout Motors as an integral part of VWAG's EV business and overall corporate strategy.

66.     Scout Motors' employees have also acknowledged that VWAG's business network and backing is critical to Scout Motors' strategy, with Scout Motors Vice President of Strategy and Brand Ryan Decker stating: "The intent [behind Scout Motors] is to combine an American start-up – speed, innovation, ingenuity, adaptability – **with the backing, scale, and money of one of the world's leading**

**FIRST AMENDED COMPLAINT**

3091323

**manufacturers,**"[7] referring to VWAG (emphasis added).

67.    It is clear from VWAG's Annual Report and the statements by several of VWAG's executives and employees that VWAG has done, or on a regular basis does, a close and comprehensive study of market conditions in each of the markets it operates in. On information and belief, VWAG is aware that California is the one of the largest economies in the world, one that is roughly equivalent in size to Germany where VWAG is located, and that California is the largest EV market in the United States.

68.    On information and belief, it is VWAG's conscious business and corporate policy to improve its competitive position in the North American and EV markets, including and especially in the United States, and a part of this conscious policy is the direction and mandate of billions of dollars of investment of VWAG funds to acquire and operate Scout Motors.

69.    On information and belief, VWAG's conscious business and corporate policy to improve its competitive position in North America also includes the direction and operation of VWGoA to carry out its business and financial strategies as VWAG's agent. VWGoA is licensed under the California Vehicle Code as both a manufacturer and distributor.

70.    Even after this lawsuit was filed on April 22, 2025, VWAG executives continued to demonstrate VWAG involvement in Scout Motors. For example, on or around April 30, 2025, VWAG Finance Director and Chief Operating Officer Arno Antlitz participated in the "Q1 2025 Volkswagen AG Earnings Call" along with Petro Zollino, VWAG Head of Corporate Communications, and Rolf Woller, VWAG Head of Group Treasury and Investor Relations. The conference call also included U.S. financial market investors from JPMorgan, Bank of America, Deutsche Bank, UBS,

---

[7] James Attwood, "Scouting report: inside VW's new off-road brand," June 28, 2025, https://www.autocar.eo.uk/car-news/features/scouting-report-inside-vws-new-road-brand.

**FIRST AMENDED COMPLAINT**

HSBC, Citigroup, Bernstein, and Jefferies. This was a "joint call for both the media and as well as investors and analysts" that was introduced as the "Volkswagen AG Investor Analyst and Media Call of Q1 2025 Conference Call."

71.    On this call, Mr. Antlitz was introduced as VWAG's Chief Financial Officer and Chief Operating Officer. He stated that the "Volkswagen Group got off to a slow start to 2025 in financial terms." In response to a question about repurposing VWAG's "€2 billion investment in Scout Motors to VWAG's existing brand portfolio," Arno Antlitz stated:

> **"We [VWAG] are driving Scout forward because it's the really biggest single promising segment, automotive segment in the industry.** Now C-pickup and B rugged SUVs in the US is, from a **profit pool perspective**, really the **most attractive segment**, and this is why we are driving forward." (emphases added).

72.    In response to a question from a JPMorgan Securities participant on the Q1 Earnings Call, Mr. Antlitz further confirmed VWAG's involvement in the United States, by stating: "we have already a strong presence in the US. We are localized in Chattanooga. We run a factory there. **We have a huge operation in the US with a lot of dealers. We are ramping up Scout, and we are strong in North America**…." (emphasis added). The dealers VWAG has in the U.S. per Mr. Antlitz's statement include the franchised dealers in the state of California who are represented by CNCDA.

73.    VWAG has invested a total of $20 billion to its North American market, including $10 billion at its Chattanooga plant, $5 billion for a joint venture with EV maker Rivian, and $5 billion for Scout Motors.[8] Mr. Antlitz stated that VWAG

---

[8] Davya Chowdhury and Victoria Waldersee, "Volkswagen to make additional investments in US, CFO says in Davos," Jan. 23, 2025, https://www.reuters.com/business/autos-transportation/ volkswagen-make-added-investments-united-states-cfo-says-davos-2025-01-23/.

**FIRST AMENDED COMPLAINT**

3091323

"need[s] additional initiatives…to double market share, you have to be even more local" in the United States and that VWAG "need[s] to be more 'value-added' in the U.S."[9] Mr. Antlitz also acknowledged that carmakers, including VWAG, plan to bring in range extenders into more of its EV models in an attempt to appeal to customers who are hesitant to make the switch to EVs.[10]

74.    VWAG's involvement in Scout Motors is also demonstrated by its utilization of VWAG's plant in Mexico to supply range extenders for Scout Motors EVs. In the Q1 Earnings Call, Mr. Antlitz stated:

> "there's, of course, we [VWAG] have a plant in Mexico…
> This plant is basically **producing the engines for Volkswagen and they go into the Volkswagen cars. And this would be also the potential engine for the range extender for the Scout**, not a turbocharged version, naturally aspirated, but this is so – we still use that."

(emphasis added). This plant – in Silao, Mexico – also produces combustion engines for the VW Jetta compact sedan, VW Taos subcompact crossover, and VW Tiguan compact crossover.[11]

75.    On information and belief, VWAG is aware of the serious questions of illegality involved in selling Scout Motors vehicles directly to US and California consumers, including, but not limited to, the statements made by Scout executives to the California Legislature, Scout Motors' failure to convince the California Legislature not to pass AB 473, and written communications by at least one California legislator encouraging Scout Motors to follow California law and not to

---

[9] *Id.*

[10] *Id.*

[11] Cristian Agatie, "Scout Intends To Scout the Combustion Engine for Its Range Extender Systems From Mexico," May 6, 2025, https://www.autoevolution.com/news/scout-intends-to-source-the-combustion-engine-for-its-range-extender-systems-from-mexico-1-250996.html.

**FIRST AMENDED COMPLAINT**

3091323

violate it by direct sales to the public.

***Defendants' Blatant Violation of the California Vehicle Code In Its Direct-to-Consumer Sales***

76.     Scout Motors does not fall within the exception in Vehicle Code section 11713.3(o)(4)(B) because Scout Motors is not using franchises within the VWGoA network to sell its vehicles. In fact, Scout Motors is not using franchisees *at all*.

77.     Scout Motors admits it is a wholly owned subsidiary of VWAG (and affiliate of VWGoA), as confirmed by VWAG executives' affirmative statements admitting as much. Indeed, statements by VWAG's executives demonstrate VWAG's control and direction of Scout Motors, including Scout Motors' activities in California. For example, as of January 8, 2025, VWAG Chief Executive Officer Oliver Blume admitted that VWAG had invested billions of dollars in North America, pointing specifically to VWAG's efforts to expand its North American reach through its brand Scout.[12]

78.     On January 17, 2025, Scout Motors' executives, to evade the law and despite multiple admissions otherwise, claimed that they are an "independent" company, separate from VWAG. In a letter to CNCDA, Scout Motors' General Counsel Mr. Sitron stated that: "Scout Motors and the Scout brand exist and operate independently of VWGoA and its brands such as Volkswagen and Audi. They will continue to do so in the future." *See* January 17, 2025 Letter from Neil Sitron to Michael Cypers. Such statements are in direct contrast to admissions from the CEOs of both Scout Motors and VWAG and directly contravene VWAG's investment and involvement in the Scout brand.

79.     Scout Motors CEO Scott Keogh also admitted on or around February 13, 2025 that Scout is "100%" a brand of VWAG, stating:

---

[12] Jack Walsworth, *With Scout and Cupra inbound, Blume confident in VW Group's fortunes in U.S.*, Jan. 8, 2025, https://www.autonews.com/volkswagen/an-ces-2025-blume-vw-group-outlook/.

24

**FIRST AMENDED COMPLAINT**

3091323

"First and foremost, **100% Scout Motors is part of the Volkswagen Group.** The Volkswagen Group, as you know as well as anyone, holds a whole host of brands from Škoda to Bentley to Porsche to Audi and other things. We are one of those brands. **Our reporting line is from here in the states, Scout Motors is a LLC, and reports into the Volkswagen Group directly in Germany. So for me, for example, I report into the Board.** We have board meetings there, we give them updates, away we go. **They are the sole provider, funder of the company as of right now**, but we've structured the company in a way that if we want to be strategic partners with someone else, if we want to seek outside capital, if potentially we want to go public, the company's been structured to do that."[13] (emphases added).

80.     In addition, Mr. Keogh stated that "[w]e [Scout Motors] are one of the brands of the Volkswagen Group, full stop. They fund it, they strategically made the decision to investment [sic]…"[14]

81.     This renders Scout Motors ineligible for any exception to the Vehicle Code because it is an affiliate of VWGoA due to their common control by VWAG.

82.     Despite Scout Motors' clear involvement in the legislative process and its knowledge that amendments to AB 473 would **"kill[] off"** Scout Motors' ability to sell its vehicles directly to California consumers, Defendants are now proceeding with a distribution model that explicitly violates the clear statutory language of AB 473. *See* August 21, 2023, Letter from Neil Sitron to California Legislature, "*Oppose Unless Amended…*" (emphasis added). Scout Motors has announced its intention to begin production of its vehicles in 2026 with a release directly to the general public in 2027.

83.     On information and belief, VWAG executives are also aware of the legal

---

[13] "The Re-Emergence of Scout Motors With President and CEO Scott Keogh," The InEVitable Podcast, at 27:52-28:42, https://www.motortrend.com/features/scout-motors-ceo-scott-keogh-inevitable-vodcast-podcast-episode-113/.

[14] *Id.* at 29:20-27.

**FIRST AMENDED COMPLAINT**

3091323

challenges and impediments under AB 473 in the California market because of Scout Motors' statements about the bill "killing off" its ability to sell its vehicles and because VWAG executives have a fiduciary responsibility to be aware of market and legal conditions in the geographic areas it operates.

84.　On information and belief, Scout Motors is highly motivated to move forward with its direct-to-consumer model because it does not want to share profits with local franchisees when selling the desirable and highly profitable Scout electric and gasoline-powered vehicles, and Scout Motors wants to reduce its warranty costs by not paying franchisees their statutory rates.

85.　On information and belief, Scout Sales, which is an affiliate of VWGoA through its involvement in Scout Motors, obtained a California dealer license through the Department of Motor Vehicles and is the entity responsible for selling and distributing vehicles to California consumers when such vehicles become available.

86.　Scout Motors has begun actively soliciting and accepting deposits for Scout Motors vehicles directly from California residents and to the exclusion of VWGoA franchised dealers. In accepting $100 deposits for vehicles, Scout Motors entered into contracts with consumers called the "Reservation Agreement." No consumer can purchase a Scout Motors vehicle without first making a $100 deposit to Scout Motors and entering the Reservation Agreement, which is a binding contract (see **Exhibit A)**.

87.　The Reservation Agreement explicitly states: "By this agreement, together with your payment of the Reservation Fee, you are reserving a **future purchase** of your selected Scout vehicle." (emphasis added). A Scout Motors vehicle cannot be sold to a consumer without that consumer first entering into the Reservation Agreement and paying the $100 deposit. The language of the Reservation Agreement reinforces this by stating that Scout Motors "will provide a credit to the final price equivalent to the Reservation Fee" when a consumer completes the future purchase of their Scout Motors vehicle.

**FIRST AMENDED COMPLAINT**

88.    On information and belief, the number of reservations and deposits Scout Motors receives and will receive will affect and alter the production volume for Scout Motors.

***Defendants' Blatant Violation of the California Vehicle Code In Its Direct-to-Consumer Marketing***

89.    Scout Motors (and Scout Sales) has engaged in extensive advertisement of its vehicles throughout California, encouraging consumers in its advertising to place a deposit directly with Scout Motors for a vehicle.

90.    Scout Motors' advertisements throughout California are false and misleading because Scout Motors does not disclose to its consumers that the transaction is illegal under the California Vehicle Code. California Business and Professions Code section 17500 makes it unlawful for a corporation to:

> "directly or indirectly **to dispose of real or personal property** or to perform services, professional or otherwise, or anything of any nature whatsoever or to **induce the public to enter into any obligation relating thereto**, to make or disseminate or cause to be made or disseminated before the public in this state…including over the **Internet**… any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is **untrue or misleading**." (emphases added).

91.    On information and belief, Scout Motors has accepted and continues to accept $100 deposits directly from California consumers to reserve Scout Motors vehicles and has stated its intention to sell new motor vehicles directly to consumers, including consumers in San Diego County.

92.    On information and belief, Scout Motors is "induc[ing] the public to enter into an[] obligation relating" to the purchase of personal property by accepting $100 deposits for its vehicles in violation of California Business and Professions

**FIRST AMENDED COMPLAINT**

3091323

Code section 17500.

***VW Causes Significant Harm***

93.     VWAG sells its vehicles throughout the United States by engaging VWGoA to target and exploit the automobile market in California for VWAG's economic benefit. VWAG is now doing the same with Scout Motors as well. There is a regular flow of vehicles from VWAG to VWGoA to franchised dealerships across the United States, including at least 55 dealerships in California, that market and sell VWAG-branded vehicles.

94.     VWGoA enters into written "Dealer Agreements" with California dealerships to sell its vehicles. These Dealer Agreements outline the relationship between automobile manufacturer as the franchisor and a local dealership as a franchisee. Under these Dealer Agreements, VWGoA sells and delivers authorized vehicles to the franchised dealership, and the dealership assumes the responsibility for the promotion and sale of those vehicles in the dealership's geographic area. Dealer Agreements are meant as a comprehensive relationship where a franchisee has access to VWAG inventory.

95.     Bypassing VWGoA franchised dealers causes significant harm to its dealers who risk losing their livelihoods in an already difficult auto industry in favor of Defendants' desire to keep profits from direct sales for themselves. Sidestepping dealers also harms Californians in other ways. Defendants' direct-to-consumer model threatens tens of thousands of jobs of other Californians connected to the dealer economy. It also deprives consumers of intra-brand competition and greatly limits options for warranty and recall work.

96.     In order to legally market Scout Motors vehicles in California, such Scout vehicles would need to be sold to California consumers through either existing California franchisees in the VWAG family of companies or newly created franchisees that are VWAG-affiliated to market and sell Scout Motors vehicles.

97.     CNCDA has suffered injury because it has diverted significant financial

28

**FIRST AMENDED COMPLAINT**

3091323

resources and executive and staff time to investigate and counteract Defendants' violations of the law. Following Defendants' announcement that Scout vehicles would be sold directly to consumers, CNCDA commissioned a comprehensive independent analysis into Defendants' illegal activity and how to bring Defendants into compliance with the law, including, but not limited to, investigation of Scout's business practices, exploration of a possible administrative action, and contact with legislators.

98.    In addition, after expending significant resources on behalf of its members to sponsor and advocate for AB 473, CNCDA has now expended even further resources to investigate Defendants' threatened and actual violations of the California Vehicle Code and to prevent the violations of the very law CNCDA worked to enact in the California Legislature, which was enacted after Scout's active participation. CNCDA's efforts to counteract Defendants' violations of the law requires CNCDA to expend even more resources that would otherwise be spent on other issues germane to CNCDA's organizational purposes.

99.    Franchised dealers across the entire country are concerned with Defendants' direct-to-consumer model. The National Automobile Dealers Association ("NADA"), which is a trade association representing nearly 16,500 franchised new car and truck dealerships across the United States, sent an instructive letter to Oliver Blume, Chief Executive Officer of VWAG on March 6, 2025. *See* **Exhibit B**. In the letter, NADA states that it:

> "fully stands behind VW, Audi, and Porsche dealers that are being left behind by this decision that violates protections provided by state law. Your U.S. dealers have always been trusted partners who have made significant investments and stood behind the brands – in good times, and bad…"

*Id*. NADA also emphasized in the letter that other vehicle manufacturers successfully launched new brands using a selected subset of their existing dealer networks for

**FIRST AMENDED COMPLAINT**

3091323

distribution, and the same could be true for Defendants' sale of Scout Motors vehicles. *See id.* NADA's March 2025 attempt to discuss Defendants' distribution model comes after numerous attempts to discuss with Defendants' management that the "franchise system is the best and most efficient way to deliver the customer experience that today's marketplace demands." *Id.*

100.   CNCDA members, including franchised dealerships who sell VWAG vehicles, are *currently* in direct competition with Scout Motors. One VWGoA franchisee dealer in northern California confirmed that "[w]e have instances of VW clients saying that they placed a deposit on a Scout and will be holding off on another VW purchase." The same dealer also stated that "[w]e have VW clients that have been wanting a truck and were excited to find out that VW now makes a truck with Scout."

101.   Another VWGoA franchisee dealership in northern California stated that customers asked their salespeople if they can reserve a Scout vehicle through VW dealers, received roughly a dozen calls or inquiries about reserving a Scout vehicle, and inquired as to whether VW's current EV models come in hybrid or plug-in hybrid variants, in line with Scout Motors' plans for its EVs. The same northern California VWGoA franchisee dealers stated that there is customer demand for a VW truck, hybrid or plug-in hybrid SUV or truck, and more SUV and crossover VW models. This is evidenced to the VWGoA franchisee dealers by customers asking if the VW pickup truck, which is currently only sold in Europe, will be available in the United States.

102.   Yet another VWGoA franchisee dealer in Southern California confirmed that Scout Motors is in direct competition with their VWGoA franchisee dealerships and their existing VW inventory, stating:

> "Volkswagen does not offer a Pickup model in their portfolio for the United States. Integrating Scout Motors into the Volkswagen franchise would expand our opportunities to compete in growing automotive segment. In addition, it will

**FIRST AMENDED COMPLAINT**

3091323

present a strategic alignment of heritage, market opportunity, and electric innovation. **We are losing customers because the Scout brand is directly advertising and taking reservations for Scout vehicles. Scout is currently competing with the Volkswagen franchise in the EV market.** Scout Motors is trying to create a direct-to-consumer path that will disrupt the delicate flow of showroom traffic and dealer-led EV sales. If walk-in opportunities shrink, my team's ability to showcase VW's available lineup—including EVs that are ready *today*—gets sidelined and that effects profits." (emphasis added).

103.    Franchised dealers in states other than California have also confirmed that Scout Motors is in direct competition with their dealerships. A Volkswagen dealer in Greenville, South Carolina stated that he reached out to VW and offered to sell Scout vehicles at his business but never heard back, stating "[t]he last thing I would ever want is for the state to give Scout more than a billion dollars and then have them competing against my own family business that we built without any government assistance."[15]

104.    Defendants' knowing violation of the Vehicle Code is so blatant that on February 6, 2025, Assembly Majority Leader and Representative in the California State Assembly, District 4, Cecilia Aguiar-Curry, who was one of the authors of AB 473, sent a letter to Neil Sitron, General Counsel of Scout Motors, and Antony Klapper, Senior Vice President and General Counsel of VWAG stating:

"VW and Scout have begun accepting deposits for Scout vehicles directly from California residents, excluding existing or future franchised dealers from the sales and service process. **Such practices violate Vehicle Code section 11713.3(o), as amended by AB 473, which expressly forbids an automaker from competing with its**

---

[15] Jeffrey Collins, "Scout Motors' effort to directly sell its electric SUVs where they'll make them stalls," Feb. 13, 2025, https://www.yahoo.com/news/scout-motors-effort-directly-sell-205731629.html.

**FIRST AMENDED COMPLAINT**

3091323

**own dealers through an affiliate brand.**

California's franchised dealerships—and the consumers they serve—stand to suffer harm from Scout's stated distribution model. Franchised dealerships provide not only sales but also local maintenance and warranty services, fueling vital economic activity throughout the state. Scout's stated plan erodes these consumer protections, eliminates local business opportunities, and disregards the clear legislative language and my intent of AB 473.

As the Assembly Majority Leader and author of AB 473, I'm asking you to reconsider Scout's distribution, sales, and service plans and ensure that Scout's practices comply with the law." (emphasis added).

(attached as **Exhibit C**).

105.   Scout Motors' CEO Scott Keogh and General Counsel Neil Sitron know, or should know, that Scout Motors' sales directly to California consumers violate the California Vehicle Code.

106.   Multiple senior executives of VWAG and VWGoA, including but not limited to Antony Klapper, Kjell Gruner, Arno Antlitz, and Oliver Blume, similarly know or should know that Scout Motors' sales directly to California consumers violate the California Vehicle Code.

107.   Defendants' blatant violation of California law must not be permitted.

## FIRST CLAIM FOR RELIEF

## UNFAIR COMPETITION, VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200

### (Against All Defendants)

108.   CNCDA hereby realleges and incorporates by this reference the allegations from the above paragraphs as if fully set forth herein.

109.   By engaging in the conduct described in this complaint, CNCDA is informed and believes that Defendants have violated and continue to violate

**FIRST AMENDED COMPLAINT**

3091323

California Vehicle Code section 11713.3(o) by taking reservations and deposits for Scout Motors vehicles in its direct-to-consumer model. Defendants' conduct alleged above constitutes and was intended to constitute unlawful and unfair business practices within the meaning of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq.*

110.   By engaging in the conduct described in this complaint, CNCDA is informed and believes and thereon alleges that Defendants have violated and continue to violate Business and Professions Code section 17500 by accepting deposits for a transaction that they knew, or should have known, was illegal and therefore untrue and misleading under the definitions of the statute. Defendants' conduct alleged above constitutes and was intended to constitute unlawful and unfair business practices within the meaning of the Unfair Competition Law, California Business and Professions Code section 17200 *et seq.*

111.   During all relevant times to this complaint, Defendants engaged in or still engage in unfair or unlawful business practices, as defined in the Unfair Competition Law, Business and Professions Code section 17200 *et seq.*, and in violation of California law.

112.   A business act or practice is unfair where it offends an established public policy or when the practice is illegal, immoral, unethical, or oppressive. Defendants have engaged in unfair business practices as a result of the actions alleged herein. By engaging in a direct-to-consumer model to reserve and sell Scout Motors vehicles, Defendants invoked, tolerated, encouraged, or enticed violation of the California Vehicle Code and the Business and Professions Code, and thus engaged in unfair business practices designed to give it an unfair competitive advantage.

113.   The acts and practices of Defendants are unlawful because they constitute a violation of the California Vehicle Code section 11713.3 and California Business and Professions Code section 17500 *et seq.*, as described in this complaint.

114.   As a result of Defendants' violation of the Unfair Competition Law,

**FIRST AMENDED COMPLAINT**

3091323

Business and Professions Code section 17200 *et seq.*, Defendants are profiting through their knowing violation of California law at the expense of consumers and Plaintiff's California members.

115. As a direct and proximate result of Defendants' conduct as described herein, Plaintiff has been forced to divert resources to investigating Defendants' illegal conduct, and therefore has been harmed in an amount to be proven at trial.

116. Plaintiff further seeks, and as a result of the foregoing is entitled to, an order granting injunctive relief against Defendants to prohibit Defendants from taking deposits for and selling Scout Motors vehicles to California consumers in their direct-to-consumer model.

117. The prevention of unfair competition sought by CNCDA in this action constitutes the enforcement of an important public right on behalf of its members and California consumers, and merits an award of attorney fees under California Code of Civil Procedure Section 1021.5.

## SECOND CLAIM FOR RELIEF

## FALSE ADVERTISING, VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17500

## (Against Scout Motors)

118. CNCDA hereby realleges and incorporates by this reference the allegations from the above paragraphs as if fully set forth herein.

119. By engaging in the conduct described in this complaint, CNCDA is informed and believes that Scout Motors violated and continues to violate the law by taking $100 deposits from California consumers for Scout Motors vehicles in its direct-to-consumer model when it knew or should have known that such transactions are unlawful.

120. Scout Motors has deliberately and willfully made, disseminated, or caused to be made or disseminated, untrue or misleading statements or by the exercise of reasonable care should have known, that the statements were untrue and

**FIRST AMENDED COMPLAINT**

3091323

misleading, with the intent to induce members of the public to place $100 deposits for Scout Motors vehicles. Scout Motors knew, or should know, that such transactions are unlawful and therefore false and misleading.

121.   Scout Motors' statements are likely to deceive consumers because it is probable that advertisements requesting $100 deposits for a Scout Motors vehicle could mislead a significant portion of targeted consumers. The targeted consumers likely to be deceived have acted and act reasonably in these circumstances.

122.   Scout Motors' conduct is likely to cause confusion, mistake, or deception, or constitute actual deception or confusion or probable deception or confusion, because a reasonable consumer would not know or have reason to know that Scout Motors' reservation and deposit system is unlawful.

123.   Based on its extensive involvement in the legislative process and its statements, Scout Motors, and several senior executives including Neil Sitron and Scott Keogh, have actual knowledge or should have known that taking $100 deposits for its vehicles is a false advertisement because they know or should know of the unlawful nature of its direct-to-consumer model.

124.   As a result of Scout Motors' violation of the False Advertising Law, Business and Professions Code section 17500 *et seq.*, Scout Motors is profiting through their knowingly misleading advertisements at the expense of California consumers and VWGoA franchisees.

125.   As a direct and proximate result of Scout Motors' conduct as described herein, Plaintiff has been forced to divert resources to investigating Defendants' illegal conduct, and therefore has been harmed in an amount to be proven at trial.

126.   Plaintiff further seeks, and as a result of the foregoing is entitled to, an order granting injunctive relief against Scout Motors to prohibit Scout Motors from taking reservations and deposits for and selling Scout Motor vehicles to California consumers in their direct-to-consumer model.

127.   The prevention of false advertising requested by CNCDA in this action

**FIRST AMENDED COMPLAINT**

3091323

constitutes the enforcement of an important public right on behalf of its members and California consumers, and merits an award of attorney fees under California Code of Civil Procedure Section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For a declaration that Defendants' direct-to-consumer model to sell Scout Motors vehicles is unlawful under California Vehicle Code section 11713.3 and that each Reservation Agreement between Scout Motors and a California consumer constitutes a separate violation of the Vehicle Code;

2.     For a permanent injunction, a preliminary injunction, and a temporary restraining order prohibiting Defendants from selling Scout Motors vehicles directly to consumers and to prevent Scout Motors from taking deposits for Scout Motors vehicles directly from California residents;

3.     For restitution in an amount to be determined at trial;

4.     For prejudgment interest;

5.     For reasonable attorneys' fees and costs incurred by Plaintiff in this action pursuant to California Code of Civil Procedure Section 1021.5; and

6.     For an award of such other and further relief as the Court deems just and proper.

DATED:  August 4, 2025

GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP

By: */s/ Joseph Leventhal*
JOSEPH LEVENTHAL
MICHAEL CYPERS
JULIE R.F. GERCHIK
WOGAI MOHMAND
*Attorneys for Plaintiff California New Car Dealers' Association*

**FIRST AMENDED COMPLAINT**