# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA NEW CAR DEALERS ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN OF AMERICA, INC., *et al.*,<br><br>Defendants. | Case No. 25-cv-1316-BAS-DEB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br>**(ECF Nos. 52, 53, 54)** |

Presently before the Court are three motions to dismiss. (ECF Nos. 52, 53, 54.) Defendants Volkswagen Group of America, Inc., Volkswagen AG, and Scout Motors, Inc., along with Scout Motors Sales LLC, move to dismiss Plaintiff California New Car Dealers Association's first amended complaint. (ECF No. 49.) The motions have been fully briefed. The Court finds Defendants' motions suitable for determination on the papers submitted. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

- 1 -

25cv1316

# BACKGROUND

The Court first identifies the parties in this action. Scout Motors, Inc. ("Scout Motors") is a Delaware corporation with its principal place of business in Virginia. (Scout Corp. Disc. Stmt. ¶ 2, ECF No. 2.)[1] Scout Motors Sales LLC ("Scout Sales") shares the same citizenship. (*See id*. ¶ 3.) Scout Sales has a dealer license in California issued by the DMV. (Compl. ¶ 85.) Scout Motors and Scout Sales shall be referred to collectively as "Scout."

Volkswagen Group of America, Inc. ("VWGoA") is a New Jersey corporation with its principal place of business in Virginia. (VWGoA Corp. Disc. Stmt., ECF No. 12.)[2] VWGoA is licensed as a manufacturer and distributor under the California Vehicle Code. (Compl. ¶ 69.)

Volkswagen AG ("VWAG") is a German corporation with its principal place of business in Germany. (VWAG Corp. Disc. Stmt., ECF No. 6.)

Plaintiff California New Car Dealers Association ("CNCDA") is a statewide trade association that represents the interests of more than 1,400 franchised new car and truck dealers. (Compl. ¶ 10.) At least some of CNCDA's members are VWGoA franchised dealers. (Compl. ¶ 18.)

At the center of this dispute is the Reservation Agreement—a direct-to-consumer agreement between Scout Motors and California residents. (Reservation Agreement, Compl. Ex. A, ECF No. 49-1.) The Reservation Agreement allows consumers to reserve a future Scout vehicle by placing a refundable $100.00 reservation. (*Id.*) Scout has announced plans to begin vehicle production in 2026 and to release vehicles to the public in 2027. (Compl. ¶ 82.)

---

[1] The parent company of Scout Motors, Inc. is Volkswagen International America Inc. ("VWIA"), a Delaware corporation. VWIA is a wholly owned subsidiary of the German corporation Volkswagen AG. (Scout Corp. Disc. Stmt. ¶ 1, ECF No. 2.)

[2] The parent company of Volkswagen Group of America, Inc is VWIA. (VWGoA Corp. Disc. Stmt., ECF No. 12.)

25cv1316

Plaintiff asserts two claims. First, Plaintiff alleges unfair competition under California Business and Professions Code § 17200 *et seq*. against all Defendants. (Compl. ¶ 109.) Second, Plaintiff alleges false advertising under § 17500 *et seq*. against Scout Motors. (Compl. ¶ 119.)[3]

Plaintiff seeks equitable relief, including: (1) a declaration that Defendants' direct-to-consumer model violates California Vehicle Code § 11713.3 and that each Reservation Agreement with a California consumer constitutes a separate violation; (2) preliminary and permanent injunctive relief prohibiting Defendants from selling Scout vehicles directly to consumers and accepting reservations from California residents; (3) restitution; (4) prejudgment interest; (5) reasonable attorney's fees and costs under California Code of Civil Procedure § 1021.5; and (6) such other relief as the Court deems just and proper. (Compl., Prayer for Relief ¶¶ 1–6.)

Defendant Scout removed this case from San Diego Superior Court. (ECF No. 1.) The Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## ANALYSIS

The gravamen of Plaintiff's complaint can be summarized as follows. Plaintiff alleges that VWGoA, Scout, and VWAG violated California Vehicle Code § 11713.3(o) by conducting a direct-to-consumer program that bypassed Volkswagen franchise dealers through a $100.00 reservation/deposit system. Further, Plaintiff alleges that Scout's Reservation Agreement constitutes false advertising because it knows or should know that the transactions are illegal under California law. In the alternative, Plaintiff alleges that Defendants' conduct is unfair.

## I.    LEGAL STANDARDS

### A.    Motion to Dismiss, Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. A Rule 12(b)(6)

---

[3] Although the FAL claim is only alleged against Scout Motors, the Court refers collectively to Scout throughout the Order for simplicity and consistency.

25cv1316

motion tests that standard by seeking dismissal for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12.

To survive a motion to dismiss, a complaint must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While legal conclusions may provide the framework of a complaint, "they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"—in other words, enough to render the claim plausible. *Id*. at 678 (citing *Twombly*, 550 U.S. at 570).

In ruling on a motion to dismiss, the court accepts the complaint's factual allegations as true and construes the pleadings in the light most favorable to the nonmoving party. *See Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). The court may not look beyond the complaint. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).

If dismissal is warranted, the court considers whether to grant leave to amend. Leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). At the same time, "a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc*., 656 F.3d 1034, 1041 (9th Cir. 2011) (citation omitted). "[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Metzler Inv. GMBH v. Corinthian Colls., Inc*., 540 F.3d 1049, 1072 (9th Cir. 2008) (quotation omitted).

**B.      Motion to Dismiss, Federal Rule of Civil Procedure 12(b)(2)**

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). California's long-arm statute extends jurisdiction to the limits of due process. *See* Cal. Civ. Proc. Code § 410.10. A federal court in California therefore asks whether personal jurisdiction over a defendant comports with federal due process.

25cv1316

Due process is satisfied when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). The strength of contacts required depends on whether the plaintiff invokes specific or general jurisdiction. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). Regarding specific personal jurisdiction over a nonresident defendant, courts have distilled the due process requirements to three factors:

> (1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068–69 (9th Cir. 2017) (citation modified).

The plaintiff bears the burden of satisfying the first two prongs. *See id.* If the plaintiff meets that burden, the burden shifts to the defendant to present a compelling case that jurisdiction would be unreasonable. *See id.*

Where the court rules on a motion to dismiss without an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *See Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). In making that determination, the court may consider extrinsic evidence and, if necessary, order jurisdictional discovery. *See Data Disc, Inc. v. Systems Technology Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). Uncontroverted factual allegations are taken as true, and any conflicts between the parties' affidavits are resolved in the plaintiff's favor. *See AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

25cv1316

## C.      Statutory Construction of State Law

A federal court sitting in diversity over a plaintiff's California state law claims applies the substantive law of California, as interpreted by the California Supreme Court. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1103 (9th Cir. 2013). Where there is no California Supreme Court decision, the federal court may interpret the state statute. *See, e.g., United States v. Certain Parcels of Land in Riverside Cnty., Cal.*, 67 F. Supp. 780, 799 (S.D. Cal. 1946).

A federal court interpreting a state statute follows that state's rules of statutory construction. *See Turnacliff v. Westly*, 546 F.3d 1113, 1117 (9th Cir. 2008). Under California law, "the ultimate task" of statutory construction is to ascertain the "Legislature's intent." *People v. Massie*, 19 Cal. 4th 550 (1998).

"California courts look first to the text of the statute, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase, and sentence in pursuance of the legislative purpose." *Garcia v. PacifiCare of California, Inc.*, 750 F.3d 1113, 1116 (9th Cir. 2013) (citing *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 32 Cal. 4th 1029 (2004)). Where the statutory language is clear and unambiguous, the inquiry ends. *See Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 490 (9th Cir. 1996) (citing *Delaney v. Superior Court*, 50 Cal. 3d 785 (1990)). Where the language is ambiguous, courts may look to legislative history for guidance. *See Kaufman & Broad Cmtys., Inc. v. Performance Plastering, Inc.*, 133 Cal. App. 4th 26, 29 (2005).

## D.      California Vehicle Code, Section 11713.3

California Vehicle Code § 11713.3 makes it unlawful for a manufacturer, manufacturer branch, distributor, or distributor branch (collectively "licensed entities") to do, directly or indirectly through an affiliate, any of the prohibited acts enumerated therein. The provisions of § 11713.3 concern the relationship between licensed entities and franchise dealers. The statute was amended in 2023 by AB 473, which took effect January 1, 2024.

25cv1316

As relevant here, § 11713.3 provides:

> It is unlawful and a violation of this code for a manufacturer, manufacturer branch, distributor, or distributor branch licensed pursuant to this code to do, directly or indirectly through an affiliate, any of the following:
>
> […]
>
> To compete with their franchisees in the sale, lease, or warranty service of new motor vehicles.

Cal. Veh. Code § 11713.3(o)(1).

Moreover, § 11713.3 carves out the following relevant exception:

> In addition to the exceptions identified in paragraphs (2) and (3), a manufacturer, manufacturer branch, distributor, or distributor branch, or an affiliate thereof, shall not be deemed to be competing with their franchisees in any of the following limited circumstances:
>
> […]
>
> When creating a new line of motor vehicles and using new or existing franchisees to sell and service those vehicles.

Cal. Veh. Code § 11713.3(o)(4)(B).

And, regarding relevant definitions, § 11713.3 defines "affiliate" as:

> "Affiliate" means a person who directly or indirectly through one or more intermediaries, controls, is controlled by, or is under the common direction and control with, another person. "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any person.

Cal. Veh. Code § 11713.3(z)(1).

- 7 -

25cv1316

**E.     California UCL, § 17200**

California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition." *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1381 (2010) (citation and quotation omitted). The UCL also prohibits, "unfair, deceptive, untrue or misleading advertising" and "any act prohibited by [the false advertising law]." *Id*. The UCL's purpose "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc*., 27 Cal. 4th 939, 949 (2002); *see Hall v. Time Inc*., 158 Cal. App. 4th 847, 852 (2008).

"[V]irtually any state, federal or local law can serve as the predicate for an action under section 17200." *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 983 (N.D. Cal. 2014) (citation omitted). Where "a UCL claim is derivative of an underlying violation of law, it must stand or fall with the underlying claim." *Becerra v. McClatchy Co*., 69 Cal. App. 5th 913, 951 (2021).

A business practice may violate the UCL as "unfair" even if it is not prohibited by any other law. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co*., 20 Cal. 4th 163, 180 (1999). The unfair prong is "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" *Id*. (quoting *Am. Philatelic Soc. v. Claibourne*, 3 Cal. 2d 689, 698 (1935)).

Actions for relief under the UCL may be brought by government officials and "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

A UCL action is equitable in nature; damages are unavailable. Prevailing plaintiffs are generally limited to injunctive relief and restitution. *See Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1144 (2003); Cal. Bus. & Prof. Code § 17203. Indeed,

25cv1316

injunctive relief is the UCL's "primary form of relief available . . . to protect consumers from unfair business practices." *In re Tobacco II Cases*, 46 Cal. 4th 298, 319 (2009).

### F.    California FAL, § 17500

California's False Advertising Law ("FAL") prohibits "untrue or misleading" advertising that is known, or reasonably should be known, to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. Specifically, the FAL makes unlawful such statements when designed to "induce the public to enter into any obligation" to purchase goods or services. Cal. Bus. & Prof. Code § 17500. The FAL's reach is broad: it prohibits "not only advertising which is false, but also advertising which although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Leoni v. State Bar*, 39 Cal. 3d 609, 626 (1985).

To state a FAL claim, a plaintiff must allege that the challenged conduct is likely to deceive a "reasonable consumer." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *see also Kasky*, 27 Cal. 4th at 951. Whether a practice is deceptive is generally a question of fact not suitable for resolution on a motion to dismiss. *See Williams*, 552 F.3d at 938.

Further, "a plaintiff must allege actual reliance" on the challenged conduct. *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020). In false advertising or misrepresentation claims, this means demonstrating actual reliance on the allegedly deceptive statements "in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 321 (2011); *see In re Tobacco II Cases*, 46 Cal. 4th at 326. In other words, the plaintiff must allege that the misrepresentations were "an immediate cause of the injury-producing conduct." *Kwikset*, 51 Cal. 4th at 327. However, a "plaintiff is *not* required to allege that the challenged misrepresentations were the *sole* or even the *decisive* cause of the injury-producing conduct." *Id*. (citation modified) (emphasis in original).

Like the UCL, the FAL permits suit by specified government officials and "by any person who has suffered injury in fact and has lost money or property as a result of a

25cv1316

violation." Cal. Bus. & Prof. Code § 17535. The FAL also authorizes injunctive relief. *See id*. Any violation of the FAL necessarily constitutes a violation of the UCL. *See Kasky*, 27 Cal. 4th at 950; *see also Hinojos*, 718 F.3d at 1103.

## II.   VWGOA

Defendant VWGoA moves to dismiss on three grounds, primarily contesting whether California Vehicle Code § 11713.3 applies to it. First, VWGoA argues the statutory phrase, "indirectly through an affiliate," requires some action on its part, which Plaintiff has not alleged. (VWGoA Mot. 9:3–7; 10:1–3, ECF No. 53.) Second, VWGoA argues that the Reservation Agreement does not constitute a completed "sale," so no statutory violation has yet occurred. (VWGoA Mot. 2:13–21.) Finally, VWGoA argues Plaintiff has failed to adequately plead its claims in accordance with Rule 8's pleading requirements. (VWGoA Mot. 6:13–7:20.)

There are no California Supreme Court decisions interpreting § 11713.3.[4] Accordingly, the Court follows California's rules of statutory construction.

Relying on the statutory text and giving the language its usual, ordinary import, the Court determines that the phrase "indirectly through an affiliate" does not require VWGoA's direction for liability. The Court finds the term "through" to be clear; it introduces how—the means by which—a manufacturer, etc. can compete with their franchisees. Even considering the definition provided by Defendant VWGoA—"used as a function word to indicate means, agency, or intermediacy: such as (a) by means of : by the agency of"—the definition's inclusion of "means" supports the Court's plain meaning interpretation. (VWGoA Mot. 9:21–23.)

---

[4] The Court acknowledges the California Superior Court decision—*California New Car Dealers Association v. American Honda Motor Co., Inc. et al*., Superior Court of California, County of Los Angeles, Case No. 25SMCV04336, (Cal. Super. Ct. Mar. 9, 2026)—which interprets § 11713.3 at the motion to dismiss stage. Plaintiff filed a Notice of Supplemental Authority bringing the case to the Court's attention. (ECF No. 63.) Defendants objected to the Notice. (ECF No. 64.) Plaintiff replied. (ECF No. 65.) After review, the Court finds that Plaintiff complied with this Court's Standing Order when filing the Notice.

25cv1316

The Court further supports its reasoning with § 11713.3's definition of "affiliate." The statute defines "affiliate" broadly, outlining three ways in which parties will be deemed affiliated—namely, when a person "controls" another person, when a person "is controlled by" another person, or when a person "is under the common direction and control with" another person. Cal. Veh. Code § 11713.3(z)(1). Especially relying on the phrase, "under the common direction and control with," the statute extends to relationships between subsidiaries under a common parent. In other words, one can possess an "affiliate" relationship without direct ownership or control; the connection of a common parent is enough. *See Sec. & Exch. Comm'n v. Francisco*, No. SACV 16-02257-CJC(DFMx), 2017 WL 5952169, at *2 (C.D. Cal. July 6, 2017) (concluding that "affiliate status may be found not only where there exists a direct or indirect ownership relationship, but also where the entities are under the influence and control of a common entity or person," according to a statute with a similar definition of "control").

The Court further finds support for its reasoning through the *Honda* decision, seemingly the only California state court decision interpreting § 11713.3(o). *California New Car Dealers Association v. American Honda Motor Co., Inc., et al.*, Superior Court of California, County of Los Angeles, Case No. 25SMCV04336, (Cal. Super. Ct. Mar. 9, 2026). There, Judge Epstein tentatively reads the statute's definition of "affiliate" to signal a broad and practical reading, stating: "At present, and for pleading purposes, the definition of 'affiliate,' . . . is intentionally broad and sweeping" and "the definition of 'control' is a practical definition rather than a formalistic one." *Id.*, slip op. at 5.

Even if the Court were to look beyond the plain meaning of the text, the statute's legislative history—as alleged by Plaintiff at this stage of litigation—supports a passive reading of "through." From a high level, § 11713.3 seeks to protect the investments of franchise dealers. (Compl. ¶ 35.) The law recognizes a power imbalance between the manufacturer/distributor and the local dealers. (Compl. ¶ 36); *see New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978) ("[T]he California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the

25cv1316

conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices[.]"). To protect franchise dealers, the previous iteration of § 11713.3 made it unlawful for a licensed entity, "To compete with a dealer in the *same line-make* operating under an agreement or franchise from a manufacturer or distributor in the *relevant market area*." Cal. Veh. Code § 11713.3(o) (effective Jan. 1, 2020 to Dec. 31, 2023 (emphasis added)).

For contextual background, the Court notes that Tesla challenged these franchise-dealer regulations with a paradigm-shifting approach, selling directly to consumers. Many state courts interpreted their franchise laws as allowing Tesla's direct-to-consumer sales model because Tesla lacked previous franchise-dealer relationships. *See, e.g.*, *Tesla Inc. v. Delaware Div. of Motor Vehicles*, 297 A.3d 625, 627 (Del. 2023) ("The General Assembly enacted the Franchise Act to address the disparity in bargaining power which permitted new motor vehicle manufacturers to exert economic pressure over their franchises. Its definitions exclude Tesla and its direct sales model, where new electric cars are not sold through franchised dealers in Delaware.").

The Tesla sales model thus appeared to have carved out an exception. True, licensed entities could not compete with their franchise dealers in the same line-make in the relevant market area. But if a parent created or acquired a new company unfettered by past franchise-dealer agreements, it seemingly could sell directly to consumers. (Compl. ¶¶ 47, 57.)

The California legislature initiated a statutory amendment in 2023, introduced by AB 473, that reworded the statute to make it unlawful for a licensed entity, "To compete with their franchisees in the sale, lease, or warranty service of new motor vehicles." Cal. Veh. Code § 11713.3(o) (effective Jan. 1, 2024).

Focusing on the change in statutory language, the Court especially notes the removal of the phrases "same line-make" and "relevant market area" that were included in the prior version of the statute. Those phrases are restrictive, and their removal signals the legislature's intent to capture more than a licensed entity's brand. (Compl. ¶¶ 3, 46.) Thus,

- 12 -

25cv1316

the statute's legislative history further supports the Court's plain meaning interpretation of "through."

As indicated above, the parties do not cite, and the Court could not find, case law interpreting "through" in the context of § 11713.3; and the Court notes that the language "directly or indirectly through an affiliate" has been consistently used in the statute since 2012. Cal. Veh. Code § 11713.3 (effective Jan. 1, 2012 to Dec. 31, 2012).

Yet, Defendant VWGoA cites *Presbyterian Camp & Conference Centers, Inc. v. Superior Court*, 12 Cal. 5th 493, 501 P.3d 211 (2021), to argue that § 11713.3 requires some affirmative act on its part to trigger liability. Defendant quotes the following language from *Presbyterian*: "the phrase 'through another' is regularly used to refer to situations in which a person will be held liable because they directed another person to act; the phrase is not employed to impose liability on otherwise blameless parties because of the actions of another person." *Presbyterian Camp & Conf. Centers*, 12 Cal. 5th at 507.

But *Presbyterian* is unpersuasive here. The issue in *Presbyterian* was whether "through another" refers to "respondeat superior" liability to determine whether omission of "through another" in a statute meant to abrogate respondeat superior liability altogether. *Presbyterian*, 12 Cal. 5th at 507–08. The California Supreme Court held it did not. *Id*. Instead, California's highest court stated that the more "natural reading" of "through another" is one that "encompasses a variety of agency situations." *Id.* at 507. The Court also highlights *Presbyterian*'s distinct context of tort liability under a Health Code provision based on common law respondeat superior compared to, here, statutory regulatory liability under the California Vehicle Code.

The Court now turns to Defendant VWGoA's second statutory argument pertaining to the word "sale." Affording significance to every word, phrase, and sentence, the statute does not require a completed sale to violate the statute. While VWGoA concentrates on the definition of "sale," the full statutory language prohibits licensed entities: "*To compete with their franchisees in the sale, lease, or warranty service of new motor vehicles.*" Cal. Veh. Code § 11713.3(o)(1) (emphasis added). Central to the statute is the concept of

- 13 -

competition. Put differently, the plain meaning of the statute prohibits competition between a manufacturer—either directly or indirectly through an affiliate—and its franchise dealers.

As with the definitional dispute over "through," the parties dispute the proper meaning of "sale."[5] The California Vehicle Code does not define "sale." Defendant Scout's motion, which Defendant VWGoA joins (VWGoA Mot. 6:8–9), seeks to define the term. Even accepting the dictionary definition of "sale"—"the transfer of ownership of and title to property from one person to another for a price"—the Court's plain meaning interpretation remains supportable: the Reservation Agreement competes in the transfer of ownership of and title to property from one person to another for a price. (Scout Mot. 11:8–10, ECF No. 52.)

The Court also notes that requiring a completed "sale" before applying the statute creates an internal inconsistency; if the sale is already finished, one can no longer compete in the sale. (VWGoA Reply 7:15–16, ECF No. 60) ("The reality is that an actual sale must be **completed**, such that title is transferred, before it is actionable under the statute." (emphasis in original)).[6]

Here, Plaintiff properly alleges that the Reservation Agreement creates competition in the sale of new motor vehicles. Plaintiff makes the following allegations regarding the experiences of California franchise dealers:

---

[5] In their motions to dismiss, the other Defendants Scout and VWAG make a similar statutory argument regarding the interpretation of "sale." (Scout Mot. 9:8–9, ECF No. 52; VWAG Mot. 20:20–23, ECF No. 54.) The Court rejects the arguments for the same reasons articulated here.

[6] In its Reply brief, Defendant VWGoA also emphasizes the change in § 11713.3(o)(1)'s language to argue that the statute tethers liability to a completed sale. (VWGoA Reply 7:19–8:2, ECF No. 60.) The 2023 statutory language stated: "To compete with a dealer in the same line-make operating under an agreement or franchise from a manufacturer or distributor in the relevant market area." Cal. Veh. Code § 11713.3(o) (effective Jan. 1, 2020 to Dec. 31, 2023). The current language states: "To compete with their franchisees in the sale, lease, or warranty service of new motor vehicles." Cal. Veh. Code § 11713.3(o) (effective Jan. 1, 2024). VWGoA argues that the prior version was broader because it made it unlawful for a manufacturer/distributer "to compete" without delineating in the "sale, lease, or warranty services." (VWGoA Reply 7:19–24.) The Court disagrees. For the reasons explained in Section II of this Order, the current iteration of the statute is "broader" because it removed the "line-make" and "relevant market area" restrictions for competition. Whether considered broader or narrower, VWGoA's argument does not demonstrate that the statute requires a completed sale.

25cv1316

- One VWGoA franchise dealer in Northern California states: "We have instances of VW clients saying that they placed a deposit on a Scout and will be holding off on another VW purchase." (Compl. ¶ 100.) And further: "We have VW clients that have been wanting a truck and were excited to find out that VW now makes a truck with Scout." (*Id*.)

- Another VWGoA franchise dealer in Northern California states that customers asked the dealer's salespeople if they can reserve a Scout vehicle through VW dealers, received roughly a dozen calls or inquiries about reserving a Scout vehicle, and inquired as to whether VW's current EV models came in hybrid or plug-in hybrid variants, in line with Scout Motors's plans for its EVs. (Compl. ¶ 101.)

- In Southern California, one VWGoA franchise dealer states: "We are losing customers because the Scout brand is directly advertising and taking reservations for Scout vehicles. Scout is currently competing with the Volkswagen franchise in the EV market." (Compl. ¶ 102.)

Beyond the two statutory arguments, VWGoA also moves to dismiss for failure to comply with Rule 8 pleading standards. VWGoA relies on this Court's decision in *George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors*, No. 22-CV-0424-BAS-DDL, 2022 WL 17330467 (S.D. Cal. Nov. 29, 2022). There, the Court said, "a plaintiff who engages in shotgun pleading abdicates its duty under Rule 8(a)(2) . . . and leaves it to the defendant (and the court) to piece together the allegations and claims . . . in order to discern the nature and factual basis of the claim of which defendant stands accused." *Id*. at *15. VWGoA argues Plaintiff lumps Defendants together in the allegations, citing to only paragraph 55 in the complaint. (VWGoA Mot. 6:2–7:20.) That paragraph states: "Defendants' ongoing program of Scout Motors (which is an affiliate of VWGoA under the Vehicle Code) selling vehicles directly to consumers is prohibited by the Vehicle Code because it cuts out the VWGoA dealers as the franchisees." (Compl. ¶ 55.) But this situation is far removed from the "shotgun" pleading issue in *George*, where the Court had to pair factual allegations with several claims against several defendants. Here, there is a

single claim against VWGoA supported by well-pleaded factual allegations. (Compl. ¶¶ 9, 25, 30, 39–40, 44–45, 53–56, 94, 106.) The pleading deficiencies articulated in *George* thus do not apply here.

In sum, as alleged, Defendant VWGoA violated California Vehicle Code § 11713.3(o): Plaintiff properly alleged that VWGoA is licensed under the California Vehicle Code as a manufacturer and distributor (Compl. ¶¶ 39–40); Plaintiff properly alleged that Scout is VWGoA's affiliate (Compl. ¶¶ 25, 44–45, 55); Plaintiff properly alleged that VWGoA has franchise-dealer relationships (Compl. ¶¶ 40, 45); and Plaintiff properly alleged that its affiliate (Scout) competes with VWGoA's franchise dealers in the sale of new motor vehicles (Compl. ¶¶ 100–02).

Thus, drawing all reasonable inferences from the facts alleged in Plaintiff's favor, Plaintiff plausibly alleges that Defendant VWGoA violated UCL § 17200. Accordingly, the Court denies Defendant VWGoA's motion to dismiss.

## III.   SCOUT

Plaintiff raises two bases of statutory liability against Defendant Scout. First, Plaintiff alleges violation of the UCL § 17200 by Scout. Second, Plaintiff alleges violation of the FAL § 17500 by Scout Motors.

Even if Scout's conduct is not strictly unlawful, Plaintiff properly pleads a violation of UCL § 17200 based on an unfair business act or practice. Put differently, Scout's conduct captures the violations of unfair competition the UCL intended to restrain.[7]

---

[7] The Court further notes that the complaint properly pled that Scout engaged in unfair competition. (Compl. ¶¶ 109–110, 112.) Paragraph 112, for example, pleads unfair business acts separately from unlawful business acts. (Compl. ¶ 112) ("By engaging in a direct-to-consumer model to reserve and sell Scout Motors vehicles, Defendants *invoked, tolerated, encouraged, or enticed* violation of the California Vehicle Code and the Business and Professions Code, and thus engaged in *unfair business practices* designed to give it an unfair competitive advantage." (emphasis added)); *see In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1047 (N.D. Cal. 2021) (discussing that the plaintiffs properly alleged unfair business practices under the UCL at the motion to dismiss stage, despite not pleading any direct violations of a statute, where the plaintiffs alleged that the defendant's conduct "impinged" other statutes).

25cv1316

Defendant Scout allegedly should have known that AB 473 restricted it from selling vehicles directly to California consumers based on the following. Scout Motors allegedly opposed AB 473. (Compl. ¶ 4.) Specifically, Scout Motors allegedly urged the California Legislature to carve out exceptions to AB 473 for its intended direct-to-consumer model. (*Id.*) And Scout allegedly proposed edits to AB 473's language, including an exception that certain affiliates be excluded from the law until 2029. (Compl. ¶¶ 50–51.) Materials for the Assembly Committee on Transportation allegedly mentioned Scout and delineated how Scout permissibly could sell its cars under the statute. (Compl. ¶ 49.)

Or Scout allegedly knew that it cannot sell directly to consumers after the passage of AB 473. Plaintiff alleges Scout Motors's General Counsel Neil Sitron said in a 2023 letter to the California Legislature that AB 473 would "kill[] off" Scout's direct-to-consumer plan. (Compl. ¶¶ 5, 52, 82–83.) In this letter, Mr. Sitron further allegedly wrote that AB 473 could prohibit Scout Motors from "sell[ing] its vehicles directly to California consumers." (Compl. ¶ 52.) And in a letter to California Senate President Toni Atkins and Appropriations Chairman Anthony Portantino, Mr. Sitron allegedly stated that: "Under [AB 473's] language . . . [a manufacturer] would be statutorily banned from deciding its distribution model in California[.]" (*Id.*) Still, Scout allegedly reached out to California consumers and entered into Reservation Agreements with them. (Compl. ¶¶ 30, 32.) As alleged, California consumers are forgoing purchases at franchise dealers because they are waiting for a Scout vehicle; the Reservation Agreement creates a future expectation of purchase. (Compl. ¶¶ 100–102.)

Based on § 11713.3's language and legislative history, the California legislature deemed it unfair for licensed entities to sell directly to consumers—thereby circumventing franchise dealers—and Scout's conduct undermines the legislature's judgment. (Compl. ¶ 54.) For the foregoing reasons, Scout has allegedly engaged in unfair business acts or practices.

The Court next discusses why it is hesitant to find Scout's conduct unlawful. To begin, the Court questions whether Scout can violate § 11713.3. The statutory language

25cv1316

restricts the ability of licensed entities "[t]o compete with *their* franchisees." Cal. Veh. Code § 11713.3(o)(1) (emphasis added). Defendant Scout Motors has no franchisees. As explained in Section II above, Scout is more likely the "affiliate" through which VWGoA allegedly violates the statute.

Moreover, the Court doubts whether FAL § 17500 applies given that Plaintiff fails to properly plead reliance. On the one hand, Plaintiff claims reliance because the *franchise dealers* relied on the franchise agreements with VWGoA. (Scout Opp'n 12:22–24, ECF No. 55.) This argument fails because the FAL claim relates to the Reservation Agreement. On the other hand, Plaintiff claims it had to divert organizational resources to address the Reservation Agreement's direct-to-consumer model and advertisement. (Scout Opp'n 13:4–7.) While such diversion may be enough to support UCL associational standing, *see Animal Legal Def. Fund v. LT Napa Partners LLC*, 234 Cal. App. 4th 1270 (2015), it is not enough to support reliance for a false advertising claim. Based on Plaintiff's allegations, the causal chain is too attenuated: namely, there is an alleged misrepresentation in a Reservation Agreement, California consumers reserve a spot and allegedly withhold purchases from franchise dealers, franchise dealers complain to CNCDA, then CNCDA diverts resources. Upon review, this tenuous causal chain cannot adequately support reliance. *See, e.g.*, *Lagrisola v. N. Am. Fin. Corp.*, 96 Cal. App. 5th 1178, 1193 (2023) (stating that the plaintiffs "do not allege that they relied on either a representation *or* an understanding created by an omission, and thus cannot allege that such a representation or omission *caused* an economic injury to them" (emphasis in original)). The Court thus dismisses the FAL claim without prejudice.[8]

---

[8] Defendant Scout also argues that Plaintiff fails to plead the FAL claim with particularity, as required by Federal Rule of Civil Procedure 9(b). (Scout Mot. 17:21–22.) Scout's challenge is limited to the FAL claim. (Scout Reply 8:1–3, ECF No. 58.) Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9. While acknowledging that Plaintiff does not allege "fraud" directly, Scout argues the false advertising claim sounds in fraud. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *see also Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019) ("UCL and FAL claims sounding in fraud are also subject to the Rule 9(b) standard."). Because the Court dismisses the FAL claim on other grounds, it does not reach the plausibility of the pleadings under the heightened standard.

25cv1316

The Court addresses three other arguments raised in Defendant Scout's motion to dismiss. First, Scout contends that the Reservation Agreement implicates extraterritorial conduct beyond the reach of California's UCL, FAL, and CVC statutes. (Scout Mot. 6:23–7:6.) Specifically, Scout argues that the Reservation Agreement is taking place outside of California. Scout pulls language from the Reservation Agreement to support its argument. For example, Scout cites the document's opening lines: "This Reservation Agreement governs the placing of a reservation with Scout Motors, Inc., 1775 Tysons Blvd, 5th Floor, McLean, VA 22102." (Scout Mot. 6:17–18; Reservation Agreement, Ex. A, at 1) (cleaned up). And then quoting the end of the document: "Scout Motors receives and accepts the Agreement and payment of the Reservation Fee at its offices in Fairfax County, Virginia. By submitting the Agreement and paying the Reservation Fee, you agree that the Agreement is formed in the state of Missouri, United States." (Scout Mot. 6:17–18; Reservation Agreement, Ex. A, at 4.)

But the concern here is not forum selection or choice of law—contexts in which the agreement's geographical language would be relevant. Instead, the question is whether the conduct implicates California consumers. *See Schott v. Ivy Asset Mgmt. Corp.*, No. 10-CV-01562-LHK, 2010 WL 4117467, at *10 (N.D. Cal. Oct. 19, 2010) ("Even accepting [the] [d]efendants' argument, the fact remains that they entered into a contract with a California citizen in California. Any alleged harm occurred in California where [the plaintiff] resides."). Here, Plaintiff properly alleges Scout entered into a Reservation Agreement with at least one California consumer and/or advertises its Reservation Agreement to California consumers. (Compl. ¶¶ 30, 32.) Plaintiff properly pleads as follows:

- Scout Motors has entered into Reservation Agreements with California consumers through which Scout Motors takes $100.00 reservations/deposits for Scout vehicles directly from California consumers through Scout Motors's website. (Compl. ¶¶ 7, 91.)
- Plaintiff alleges Scout actively solicits reservations from California residents. (Compl. ¶ 86.)

25cv1316

- Plaintiff alleges Scout advertises its vehicles throughout California. (Compl. ¶ 89.)

The UCL thus applies to the alleged conduct because, regardless of the Reservation Agreement's geographical language, Scout has entered into agreements with California consumers through its direct-to-consumer sales model. Scout's cited case law is inapplicable to the present factual context. *Cf. Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1194 (2011) (discussing whether a court should apply California law to three non-California residents "who work both [in California] and in other states for a California-based employer"); *Ward v. United Airlines, Inc.*, 9 Cal. 5th 732, 740 (2020) (discussing whether a court should apply California law to pilots and flight attendants who "reside in California but perform most of their work in airspace outside California's jurisdiction"). Moreover, any remedy reached applies only to California consumers. (Scout Opp'n 4:27–5:1.)

Next, Defendant Scout argues that its conduct is shielded from UCL liability under the "safe harbor" doctrine. Where "specific legislation" expressly permits the challenged conduct, the safe harbor doctrine shields that conduct from "general unfair competition law" liability. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1164 (9th Cir. 2012) (quoting *Cel-Tech.*, 20 Cal. 4th at 182 ). To bar a UCL action, the specific legislation "must absolutely preclude private causes of action or clearly permit the defendant's conduct." *Zhang v. Superior Ct.*, 57 Cal. 4th 364, 379–80 (2013); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1001 (9th Cir. 2023) (highlighting the difference between "not making an activity unlawful," and "making that activity lawful" (quotation omitted)).

Scout argues two sources of law clearly permit its direct-to-consumer conduct. Both fail. For one, Defendant Scout points to California Vehicle Code § 285(a) and (b), arguing it is allowed to sell directly to consumers under its DMV licenses.[9] The referenced statutory language states:

---

[9] In its motion to dismiss, VWGoA requests judicial notice of the following DMV licenses. (Scout Mot. 12:13–13:21.) In 2023, Scout Motors applied to and received from the DMV a manufacturer's license. (Ex. 1, ECF No. 52-3.) In 2024, the DMV renewed its manufacture's license. In 2023, Scout Sales

25cv1316

> "Dealer" is a person […] who:
>
> (a) For commission, money, or other thing of value, *sells*, exchanges, buys, or offers for sale, negotiates *or attempts to negotiate, a sale* or exchange of an interest in, a vehicle […] or induces or attempts to induce any person to buy or exchange an interest in a vehicle and, who receives or expects to receive a commission, money, brokerage fees, profit, or any other thing of value, from either the seller or purchaser of the vehicle.
>
> (b) Is engaged wholly or in part in the *business of selling vehicles* or buying or taking in trade, vehicles for the purpose of resale, selling, or offering for sale, or consigned to be sold, or otherwise dealing in vehicles, whether or not the vehicles are owned by the person.

Cal. Veh. Code § 285 (a), (b) (emphasis added).

But the cited statutory language is definitional. And finding a "safe harbor" in this provision would compromise California's well-established regulation of licensed dealers, notwithstanding the definition. *See, e.g.*, *Valiyee v. Dep't of Motor Vehicles*, 74 Cal. App. 4th 1026, 1029 (1999) (affirming that Vehicle Code § 11713(m), and § 11705(a)(3) applied to a licensed dealer).

Relatedly, Defendant Scout argues it is shielded from liability because the DMV approved then renewed its licenses. Scout cites two cases for support, but both are

---

applied to and received from the DMV a vehicle dealer license. (Ex. 2, ECF No. 52-4.) In 2024, the DMV renewed its vehicle dealer license. Further, Scout Sales claims it has two employees licensed by the DMV as salespersons. (Ex. 3, ECF No. 52-5.) The Court may consider documents that are incorporated by reference but not physically attached to the complaint if they are central to the claims and no party questions their authenticity. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). In addition, pursuant to Federal Rule of Evidence 201, courts may take judicial notice of facts that are not subject to reasonable dispute because they are generally known or are capable of accurate and ready determination. Fed. R. Evid. 201. The request for judicial notice is granted.

25cv1316

inapplicable here. In *Martin v. Ford Motor Co.*, No. CV 20-10365-DMG (JPRx), 2025 WL 1012299, at *1 (C.D. Cal. Mar. 28, 2025), the issue was whether an MECS pump was to be considered an "emissions-related part" and thus covered by California Emissions Warranty. A previous certification from the California Air Resources Board ("CARB") included review and approval of the MECS pump as a component *not* to be designated as an "emissions-related part." *Id.* at *8. The *Martin* court went out of its way to decline an "implied" safe harbor—the idea that one can exercise the safe harbor provision just because another agency provided some approval. *Id.* at *10 ("[T]he Court declines to find that CARB certification under the California Emissions Warranty statutory scheme insulates *all* parts of *all* PZEVs not included by manufacturers in the emissions warrantied list. Doing so would create the "implied" safe harbor cautioned against by the California Court of Appeals." (emphasis in original)). Instead, the *Martin* court relied on the evidentiary record that demonstrated "with specificity" that "CARB did consider the very part that is at issue[.]" *Id.*

In *Angiano v. Anheuser-Busch InBev Worldwide, Inc.*, 532 F. Supp. 3d 911, 917 (C.D. Cal. 2021), the plaintiffs argued that Beck's beer bottles violated the UCL because the bottles stated the beverage was non-alcoholic, "without including the required warning that the beverage contains 'less than 0.5 percent (or .5%) alcohol by volume' in direct conjunction with the use of the phrase 'non-alcoholic' in readily legible printing and on a completely contrasting background." *Id.* at 915. But the regulatory body U.S. Treasury Department's Alcohol and Tobacco Tax and Trade Bureau ("TTB") issued a Certificate of Label Approval, approving Beck's label as compliant with federal regulation. *Id.* at 917. The evidence before the *Angiano* court thus demonstrated that the defendant had received regulatory approval for label compliance under the same regulation. *Id.*

Here, in contrast to *Martin* and *Angiano*, there are no facts showing that the DMV specifically reviewed compliance with § 11713.3(o) before issuing a license. Given the factual dissimilarity, these two cases are inapposite.

25cv1316

For another, Defendant Scout argues the § 11713.3(o)(4)(B) exception explicitly permits its conduct. The statute exempts the following conduct from liability:

> [A] manufacturer, manufacturer branch, distributor, or distributor branch, or an affiliate thereof, shall not be deemed to be competing with their franchisees in any of the following limited circumstances [...] When creating a new line of motor vehicles and using new or existing franchisees to sell and service those vehicles.

Cal. Veh. Code § 11713.3(o)(4)(B).

If anything, § 11713.3(o)(4)(B) cuts against Scout's position. That provision permits a manufacturer to sell a new line of motor vehicles (like Scout), but only if the manufacturer utilizes its existing franchise dealer network. As Plaintiff alleges, during the legislative process, the exception was added in response to Scout's concerns. (Compl. ¶¶ 4, 56.) The exception in other words allows Scout vehicles to be sold, just not directly to consumers.

In response, Scout argues that Scout Sales was licensed as a vehicle dealer before AB 473 passed into law, which makes Scout Sales an "existing" Scout vehicle dealer and/or franchisee when the statute went into effect. (Scout Mot. 15:5–8.) The Court does not understand the logic of this argument or how it relates to the exception at issue, which seemingly addresses VWGoA's "existing franchisees." Defendant Scout provides no other legislation that absolutely precludes a private cause of action or clearly permits its direct-to-consumer conduct.

Finally, Scout argues that enjoining its direct-to-consumer sales model would constitute a collateral attack on the DMV's authority. Scout cites to the DMV's statutory authority to grant or deny a license: § 11703 states that the DMV "may" deny a license, and § 11705.4 states that the DMV "may" grant a license. These statutes grant permissive authority to the DMV—they do not vest that authority exclusively in the DMV. Scout's assertion that the DMV has "sole jurisdiction" finds no support in the language of the cited

25cv1316

statutes. (Scout Mot. 16:8–10.) Accordingly, there is no danger of a collateral attack on the DMV's licensing authority.

The Court next turns to the arguments regarding remedies. First, Plaintiff does not need to allege class claims; Plaintiff relies on associational standing, and Defendants' motions do not contest such standing. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986) ("The Secretary's presentation, however, fails to recognize the special features . . . that distinguish suits by associations on behalf of their members from class actions."). In conclusion, Plaintiff does not need to comply with class action requirements under UCL § 17203; Plaintiff can seek relief on its own behalf. Second, the parties contest which remedies are available, but the Court need not decide the particulars of remedies at the motion to dismiss stage. *See Beasley v. Conagra Brands, Inc.*, 374 F. Supp. 3d 869, 879 n.2 (N.D. Cal. 2019).

Thus, drawing all reasonable inferences from the facts alleged in Plaintiff's favor, Plaintiff plausibly alleges that Defendant Scout violated UCL § 17200. Accordingly, the Court grants in part and denies in part Defendant Scout's motion to dismiss. Specifically, the Court grants Scout's motion to dismiss the FAL claim without prejudice, but denies Scout's motion to dismiss the UCL claim.

## IV. VWAG

Unlike the other two Defendants, VWAG moves to dismiss not only for failure to state a claim but also for lack of personal jurisdiction. As noted, VWAG is headquartered in Germany and serves as the ultimate parent company of both VWGoA and Scout. Upon review, the Court concludes that it cannot exercise personal jurisdiction over VWAG based on Plaintiff's complaint.

Plaintiff seeks to establish specific personal jurisdiction over VWAG. Plaintiff does not allege California-specific VWAG contacts independent of VWGoA and Scout's contacts. (Compl. ¶ 31.) In other words, Plaintiff seeks to ascribe the subsidiary's contacts to the ultimate parent. (Compl. ¶¶ 30–31, 57, 59, 63–65, 68–69, 93.)

- 24 -

25cv1316

A parent-subsidiary relationship alone is insufficient to establish personal jurisdiction over a parent company based on its subsidiary's minimum contacts with the forum. *Doe v. Unocal Corp.*, 248 F.3d 915, 925 (9th Cir. 2001) (abrogated on other grounds); *see also Transure, Inc. v. Marsh and McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir. 1985).

Whether an "agency" theory can fill that gap depends on the type of jurisdiction at issue. As to general jurisdiction, the Supreme Court has foreclosed the agency theory. *See Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014). As to specific jurisdiction, the question remains unsettled. The Ninth Circuit has recognized that *Daimler* "left open the question of whether an agency relationship might justify the exercise of specific jurisdiction." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017). Nevertheless, courts within the Ninth Circuit have since expressed doubt on that point, observing that *Daimler*'s rationale "would seem to undermine application of [the agency test] even in specific jurisdiction cases." *Id*. at 1024 (citation omitted). Assuming an agency theory remains viable for specific personal jurisdiction, the Ninth Circuit held that any such standard requires that "the parent company must have the right to substantially control its subsidiary's activities." *Id*. at 1024–25.

A parent corporation does not expose itself to agency theory liability merely by involvement in its subsidiaries' activities, provided that involvement remains "consistent with the parent's investor status." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998); *see Sunderland v. PharmaCare U.S., Inc.*, No. 23CV1318-JES (AHG), 2024 WL 2116069, at *4 (S.D. Cal. May 10, 2024) ("[Substantial control] requires a showing higher than 'normal oversight of a parent over a subsidiary' and more akin to 'control of day-to-day operations.'" (citation omitted)). Appropriate parental involvement includes monitoring the subsidiary's performance, supervising its finance and capital budget decisions, and articulating general policies and procedures. *See id*; *see Sonora Diamond Corp. v. Superior Ct*., 83 Cal. App. 4th 523, 542 (2000) ("The relationship of owner to owned contemplates

- 25 -

25cv1316

a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter.").

Plaintiff argues that a parent does not need to manifest control because the agency standard merely requires the "ability" to control. (VWAG Opp'n 11:3–5, ECF No. 56.) This interpretation would ascribe most contacts of a subsidiary to a parent, allowing the mere existence of a parent-subsidiary relationship to create jurisdiction. The Court rejects such a reading.

Here, Plaintiff does not properly allege an "agency theory" of personal jurisdiction. Nor does Plaintiff allege an "alter ego" theory. While Plaintiff makes a number of allegations regarding the relationship among VWAG, VWGoA, and Scout, none of them support control. (Compl. ¶¶ 31, 59–83, 93.) For example, Plaintiff highlights an alleged public statement by Scout's CEO that Scout is a part of the "Volkswagen Group," and that, as Scout's CEO, he "reports into the Volkswagen Group directly in Germany." (Compl. ¶ 79.) Moreover, Plaintiff alleges that Scout's CEO identified VWAG as Scout's "sole provider, funder of the company as of right now[.]" (*Id.*) Other allegations include references to public statements by VWAG executives, a 2024 Annual Report, and investment history. (Compl. ¶¶ 59–83.). *Cf. Fisher & Paykel Healthcare Ltd. v. ResMed Corp.*, No. 16CV2068 DMS (WVG), 2017 WL 3635105 (S.D. Cal. Jan. 11, 2017) ("Furthermore, the use of a common trade name and references to a conglomerate as a collective entity, when included in statements intended to be read by the consuming public, cannot create a single entity structure given the sophistication and complexity of today's corporate world." (citation modified)). The alleged practices are consistent with VWAG's parent status; the Court finds that Plaintiff has failed to demonstrate the substantial control necessary to disregard corporate separateness.

Even if Plaintiff properly pled an agency theory, the Piep Declaration along with the Supplemental Piep Declaration directly contradict allegations of control. The Piep Declaration states in paragraph 19, for example, "VWAG does not exercise day-to-day control over VWGoA or Scout Motors, each of which is a separate, independent business

25cv1316

from VWAG." (Piep Decl. ¶¶ 13–14, 16–20, ECF No. 54-2.) Accordingly, the Piep Declaration directly contradicts an agency theory or relationship. *See Yamashita v. LG Chem*, Ltd., 62 F.4th 496, 508 (9th Cir. 2023) ("In the context of a motion for jurisdictional discovery, just as in the context of a motion to dismiss for lack of jurisdiction, bare allegations are trumped by sworn statements to the contrary.").

The parties debate the appropriateness of the Piep Declaration under Federal Rule of Evidence 602. The evidentiary rule states: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Plaintiff contends that Piep lacks personal knowledge and that case law requires declarations from senior officials—yet Piep holds the title of "Senior Global Discovery Specialist." *Cf. Payrovi v. LG Chem Am., Inc.*, 491 F. Supp. 3d 597, 603 (N.D. Cal. 2020) (accepting the declaration of a Compliance Manager that averred "LGC Ltd., LG Chem Michigan, Inc., and LGC America are all separate legal entities, that LGC America has its own corporate officers, that LGC Ltd. does not pay any of LGC America's employees or expenses, and that LGC Ltd. does not manage the day-to-day activities of LGC America"). The evidentiary rule does not require that a declarant be the "best" source. Piep's supplemental declaration notes he relied on the following sources: (i) Accounting, (ii) Human Resources Compliance, (iii) Legal (Corporate, Regulatory and Real Estate), (iv) Corporate Strategy, (v) Production & Logistics, (vi) Real Estate Asset Management and Processes, (vii) Tax, and (viii) Treasury Controls and Global Cash Management; the Legal Departments of VWGoA and Scout Motors; as well as VWGoA's Real Estate Department. (Piep Decl. Supp. ¶¶ 5–7, ECF No. 59-1.) Accordingly, the Court finds Piep satisfies the personal knowledge requirement, and his declaration directly disputes the factual allegations.

Without establishing an agency theory, the Court cannot proceed to a minimum contacts analysis. But even if the Court were to do a minimum contacts analysis, the Court doubts Plaintiff would be successful in alleging specific personal jurisdiction. For example, Plaintiff cites the California state court decision in *L.W. v. Audi AG* to argue purposeful

- 27 -

availment. 108 Cal. App. 5th 95 (2025), reh'g denied (Feb. 6, 2025), review denied (Apr. 23, 2025), cert. denied, No. 25-349, 2026 WL 135621 (U.S. Jan. 20, 2026). The Court does not find the reasoning particularly persuasive here. The *L.W. v. Audi AG* case is about specific personal jurisdiction based on a stream of commerce theory: a personal injury claim allegedly caused by a vehicle from a foreign manufacturer. And further, the Court fails to see how the stream of commerce contacts arise out of or relate to the cause of action.

In the alternative, Plaintiff requests jurisdictional discovery. "[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery. . .." *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (citation omitted). Here, the Court declines Plaintiff's request for jurisdictional discovery for the following reasons. First, Plaintiff does not provide explanations or affidavits regarding what jurisdictional discovery could reveal; the request is broad, seeking information on VWAG's corporate relationships. (VWAG Opp'n 18:15–18.) Moreover, Plaintiff knew about the Piep Declaration before filing its amended complaint. (ECF No. 40-2); *see, e.g.*, *Johnson v. Charter Commc'ns, Inc.*, No. 21-CV-06135-HSG, 2022 WL 2643980, at *3 (N.D. Cal. July 8, 2022) (citing *LNS Enterprises LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) ("If [the plaintiff] had filed affidavits or declarations in response, the Court would have been obligated to resolve conflicting statements in [the plaintiff's] favor." (citation modified)). Finally, the Court notes that Plaintiff still has viable Defendants and remedies in this action without VWAG.

Given that the Court grants the motion to dismiss for personal jurisdiction, it does not reach the motion to dismiss for failure to state a claim under Rule 12(b)(6). That said, the Court briefly addresses VWAG's arguments. Of particular relevance, VWAG argues it does not meet the statute because Plaintiff neither alleges it is licensed under the California Vehicle Code nor that it has franchisees. (VWAG Mot. 19:15–18, 20:1–6, ECF No. 54.)

In its Opposition brief, Plaintiff seeks to argue that VWAG is at least an "affiliate" of VWGoA under § 11713.3. (VWAG Opp'n 23:6–9.) For one, Plaintiff fails to allege this

25cv1316

point in its complaint. For another, even if VWAG was considered an "affiliate"—the means by which a licensed entity like VWGoA could violate the statute—the statute does not tether liability to that status. In other words, the statute does not create independent liability for falling into the "affiliate" category.

Accordingly, the Court dismisses VWAG without prejudice for lack of personal jurisdiction.

## CONCLUSION

Accordingly, the Court **DENIES** Defendant VWGoA's motion to dismiss. (ECF No. 53.) The Court further **GRANTS IN PART** and **DENIES IN PART** Scout's motion to dismiss. (ECF No. 52.) Specifically, the Court grants Scout's motion to dismiss the FAL claim for failure to plead reliance, dismissing the FAL claim without prejudice; and the Court denies Scout's motion to dismiss the UCL claim. The Court, finally, **GRANTS** VWAG's motion to dismiss without prejudice. (ECF No. 54.)

If Plaintiff chooses to file a second amended complaint against Defendants, Plaintiff must do so by April 13, 2026. Should Plaintiff fail to file an amended complaint, Defendants VWGoA and Scout are directed to answer the first amended complaint by April 20, 2026.

**IT IS SO ORDERED.**

**DATED: March 30, 2026**

_____
**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

- 29 -

25cv1316